TRUCK TERMINALS, INC., Petitioner on Review,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent on Review.

No. 17167.

United States Court of Appeals
Ninth Circuit.

Feb. 20, 1963.

---

Russell & Schureman, and Theodore W. Russell, Los Angeles, Cal., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Charles B. E. Freeman, and Meyer Rothwack, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before CHAMBERS, HAMLEY and DUNIWAY, Circuit Judges.

HAMLEY, Circuit Judge.

This matter is before us on the petition of Truck Terminals, Inc. (Truck Terminals), to review a decision of the Tax Court redetermining deficiencies in petitioner's income taxes for 1952, 1953 and 1954. The findings of fact and opinion of the Tax Court are reported in 33 T.C. 876. We have jurisdiction under section 7482 of the Internal Revenue Code of 1954.

The problem before us concerns the basis to be attributed to seventy-eight pieces of motor vehicle equipment in computing depreciation and long-term capital gain during the years in question.

Truck Terminals, a Nevada corporation, was organized on April 23, 1951 by F. M. Hodge, Henry N. Hodge and William E. Mullikin. The company was originally organized for the purpose of acquiring certain real property from Fleetlines, Inc., (Fleetlines), a Nevada corporation, organized in 1947, in which the Hodges and Mullikin were the principal shareholders. Some steps were taken to effectuate that purpose, but, due to a change of plans, Truck Terminals was not actively engaged in any business between August, 1951 and March, 1952. It then had no capital, no enforceable stock subscriptions, no assets, and a debt of $100.

During that period, and before, Fleetlines was engaged in business as a common carrier of property by motor vehicle in interstate commerce, and as a non-public utility carrier within California. In March, 1952 Fleetlines was seeking to acquire public utility common carrier status in California and to purchase control of another interstate motor carrier. Fleetlines was also then engaged in litigation for alleged violations of California statutes relating to registration of motor vehicles.

Prior to April 1, 1952, the officers, directors and shareholders of Fleetlines determined to undertake a course of action designed to meet that company's current problems and future needs. Specifically, it was decided that: (1) Truck Terminals should be activated as a wholly-owned subsidiary of Fleetlines; (2) Fleetlines should purchase the only shares of stock in Truck Terminals to be issued; (3) Fleetlines should transfer its motor vehicular equipment to Truck Terminals; and (4) Truck Terminals should rent the equipment, and any subsequently acquired, to Fleetlines, or any other lessees who could be attracted.

On April 1, 1952, Truck Terminals and Fleetlines executed a sales agreement under which the former acquired seventy-eight units of motor vehicle equipment for the stated price of $221,-150.[1] The purchase price was payable $5,150 on May 1, 1952, and the balance in monthly installments of $6,000 each. Interest was payable on delinquent installments at the rate of seven percent per annum, payable and compounded

---

1. It is not questioned that this figure represents fair value of the equipment at that time. Fleetlines' adjusted cost basis on this property at the time of the transfer, however, was approximately $101,-000.

semiannually. Title was retained by Fleetlines until the payment of the first installment on the purchase price.

Fleetlines reserved the right to rescind upon default and to pay taxes, insurance and other costs necessary to protect or preserve the property. Under the agreement, a breach by Truck Terminals, seizure of the property by others, or bankruptcy of Truck Terminals, would operate to accelerate and make due all unpaid obligations at the option of Fleetlines. The agreement did not reserve a lien upon the property to Fleetlines. It was understood that, if necessary, Truck Terminals could pledge the equipment as collateral for loans from whatever source.

Truck Terminals rented the equipment to Fleetlines commencing April 1, 1952. The monthly rate took into account the rate charged by others and the factor of renting the entire fleet. For the rental price, Truck Terminals provided fuel, upkeep and maintenance, and paid all other charges except the wages of drivers and certain types of insurance and taxes. A draft of a written lease agreement was prepared but never executed because the document as prepared did not reflect the true agreement of the parties as to rates and expenses.

On April 28, 1952, Truck Terminals issued fifty shares of its common stock to Fleetlines in return for $5,000 cash. On May 1, 1952, Truck Terminals' cash balance was $4,958.90. It made no payments to Fleetlines on the sales agreement until May 29, 1952. No interest was charged or paid on this or other delinquent payments.

Subsequently, monthly payments were made from five to twenty-four days after the first of each month. In September and October, 1952, Truck Terminals paid Fleetlines $51,000 more than the amount specified in the agreement. In December, 1952, Fleetlines advanced $160,000 on open account with no specified interest rate or repayment dates, and Truck Terminals paid $129,000 as the balance remaining under the agreement of sale. Fleetlines subsequently made further advances of $35,000.

In April, 1953, Truck Terminals issued 1,950 additional shares of stock, valued at $195,000, to Fleetlines. In return it received Fleetlines' check in that amount in payment for the stock. Truck Terminals thereupon issued its check in the same amount to Fleetlines in payment of the advances on open account. Subsequent to April 23, 1953, Truck Terminals established its own credit and did not finance its purchases through Fleetlines.

It is provided in section 113(a) of the Internal Revenue Code of 1939 (Code) that the basis of property shall be its cost, with certain exceptions. One of these exceptions, provided for in section 113(a) (8), is that if the property was acquired after December 31, 1920, by a corporation by the issuance of its stock or securities in connection with a transaction described in section 112(b) (5) of the Code.

"* * * then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

The Tax Court held that the equipment in question was acquired by Truck Terminals in connection with a transaction described in section 112(b) (5), and that the exception set forth in section 113(a) (8) is therefore applicable. It further held that, in applying that exception, the basis to Truck Terminals should be the same as it would have been in the hands of Fleetlines without increase by the amount of gain recognized in fact by Fleetlines in computing and paying its own taxes. Both of these rulings are drawn into question on this review.

Turning to the first, the issues revolve around the application, under the circumstances of this case, of section 112(b) (5). In pertinent part, that section reads:

"No gain or loss shall be recognized if property is transferred to a

corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; * * *."

The Tax Court based its decision that the transfer of the seventy-eight pieces of motor vehicular equipment by Fleetlines to Truck Terminals was of a kind described in section 112(b) (5) on two ultimate findings of fact, i. e.: (1) the transfer was not effected by a bona fide sale and purchase, and (2) the transfer was made by Fleetlines solely in exchange for stock or securities in Truck Terminals. Truck Terminals questions both of these findings of fact.

Concerning the finding that the transfer was not effected by a bona fide sale and purchase, Truck Terminals argues that the Tax Court failed to consider criteria it was required to consider, applied improper criteria, failed to consider uncontradicted evidence, and drew unreasonable inferences.

The criteria which the Tax Court was required to consider, but which it did not, petitioner urges, is whether the parties acted with a purpose of tax evasion.

The transaction as evidenced by the written agreement is, in form, a sale and purchase of equipment. Petitioner argues from this that: (1) the transaction could not be held to be of some other character unless the form was used to disguise some different purpose; (2) the only concealed purpose which could possibly have materiality here is one of tax evasion; and (3) the Tax Court made no effort to ascertain, and made no finding, as to whether the parties were so motivated.

Within little more than a year after the purported sale, Fleetlines ended up owning two thousand shares of Truck Terminals stock. The circumstances attending the sale, when viewed in the light of this fact and the transactions which took place during the intervening year, led the Tax Court to conclude that the sale was not bona fide; that it was actually a transfer of property in exchange for a proprietary interest in Truck Terminals.

If the Tax Court's finding is not otherwise clearly erroneous, then whatever the parties' motives in going through the motions of a sale, the tax consequences of sections 112(b) (5) and 113(a) (8) must follow. For in a case such as this, in which the business reasons for making the transfer are not disputed, motives themselves are not controlling in characterizing the transaction utilized to effect the transfer. They serve only as a means of getting at the intent of the parties and hence as one indication of the true nature of the transaction.

Thus, evidence of a non-tax business reason for choosing a sale would tend to confirm that the real nature of the transaction conformed to its form. Miller's Estate v. Commissioner of Internal Revenue, 9 Cir., 239 F.2d 729, 734. Lack of such a non-tax purpose would be worthy of note; not because it necessarily indicated a divergence of substance from form, but because it failed to negate other evidence inducing that inference.

On the other hand, evidence of a motive to minimize taxes might well prompt a closer scrutiny of a given transaction to determine its true nature. But a specific finding that the use of a certain form was actuated by a desire to minimize taxes is not essential to a conclusion that the substance of a transaction differs from its form.

Parties might proceed oblivious to tax consequences in attempting to accomplish by sale what can only be done through some other transaction. Or, even if fully apprised of the tax consequences of alternative courses of action, given a legitimate non-tax objective, taxpayers are not bound to choose the most nor the least tax-burdensome means of accomplishing it. Kraft Foods Company v. Commissioner of Internal Revenue, 2 Cir., 232 F.2d 118, 127–128. The existence or absence of certain motives need

not be the sole, nor is it always the most reliable, guide to be followed in characterizing actions with tax consequences.

■ The Tax Court's findings and opinion reveal that it was guided by the principles outlined above in concluding that the transaction of April 1, 1952 was not a bona fide sale. We hold that its finding is not clearly erroneous.

In its second argument against the finding of fact that the transaction was not effected by a bona fide sale and purchase, Truck Terminals argues that the Tax Court applied improper criteria in three respects. These three questioned criteria are: whether there was a valid business reason independent of tax considerations for the choice of a sale as a method of transfer; whether this transaction, negotiated between a parent and subsidiary, involves terms · of a kind which would be negotiated by independent parties; and whether Truck Terminals was adequately capitalized.

The principal burden of petitioner's argument on this point appears to be that the transaction could be a bona fide sale even if tax considerations were the principal objective, or the transaction was not of a kind which would be negotiated by independent parties, or Truck Terminals was inadequately capitalized, or even if all three of these circumstances existed.

The Tax Court did not rest its ultimate finding as to the bona fides of the sale and purchase upon any one of these criteria, or upon these three alone. As indicated in the margin, the Tax Court also took other factors into account.[2]

■■ The question as to the character of the transaction was one of fact. Cohen v. Commissioner, 2 Cir., 148 F.2d 336. The problem was to determine the intent of the parties as ascertained from all relevant facts and circumstances, Sarkes Tarzian, Inc. v. United States, 7 Cir., 240 F.2d 467, 470. No single criterion governs. Gooding Amusement Co. v. Commissioner of Internal Revenue, 6 Cir., 236 F.2d 159, 165.

■ We hold that the Tax Court did not err in giving application to the questioned criteria along with others in the process of reaching its ultimate finding as to the true character of the transaction.

In its third argument against the finding of fact that the transaction was not effected by a bona fide sale and purchase, Truck Terminals argues that in a number of respects the Tax Court failed to consider uncontradicted evidence. Several kinds of "uncontradicted evidence," all assertedly ignored by the Tax Court, are referred to, as follows: (1) evidence as to the business reasons for making the transfer by sale rather than in some other way; (2) evidence as to the significance of tax motives for the selection of a sale as the method of transfer; and (3) evidence on the subject of "thin" as compared to "adequate" capitalization.

■ The fact that particular items of evidence were not mentioned in the findings or opinion of the Tax Court does not establish that they were not considered by that court. Nor does the circumstance that the ultimate finding is not

2. In its opinion the Tax Court stated: " * * * Petitioner made the initial payment to its parent 28 days after the time specified in the agreement. Subsequently, monthly payments were made from 5 to 24 days after the first of each month. In September and October, 1952, petitioner paid the parent $51,000 more than the amounts specified in the agreement. In December 1952, the parent advanced $160,000 on an open account with no interest and no specified dates of repayment; and petitioner paid $129,000 as the balance remaining under the agreement of sale. The parent sub-sequently made further advances of $35,000; and in April 1953 petitioner issued additional stock in the amount of $195,000. It received Fleetlines' check for this amount and it, in turn, issued to Fleetlines its check in the same amount in payment of advances appearing against it on open account on Fleetlines' books. Petitioner does not claim that the parent preserved any lien upon the equipment transferred; rather, it introduced evidence that the parent intended that the equipment be used by petitioner as collateral in securing loans from independent lenders." 33 T.C. 876, 887.

in accord with what petitioner regards as uncontradicted evidence prove that such evidence was not considered. It proves at most that the Tax Court did not regard the evidence as uncontradicted or otherwise reliable when appraised in the light of the entire record.

Finally, petitioner argues that the Tax Court finding as to the bona fides of the sale and purchase transaction is based on inferences which are not reasonably warranted by the entire evidence. We are asked to draw our own inferences based upon the undisputed evidentiary facts and, in the process, to determine that the sale and purchase was bona fide.

In reviewing the Tax Court determinations the "clearly erroneous" provision of Rule 52(a), Federal Rules of Civil Procedure, applies not alone to the evidentiary facts but also to factual inferences from undisputed facts. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218.

Our study of the record does not convince us that the factual inferences which the Tax Court has drawn from the undisputed evidence are clearly erroneous.

Turning to the Tax Court finding of fact that the transfer was made by Fleetlines solely in exchange for stock or securities in Truck Terminals, petitioner advances generally similar arguments. The first of these is that the Tax Court failed to consider the following essential criteria: (1) the source of the payments; (2) the intent of the parties;

and (3) the adequacy of the capitalization.

In our view the findings of fact and opinion of the Tax Court disclose that each of these criteria was given consideration. We need not, and do not, decide whether consideration of each of them was required.

Further challenging this ultimate finding of fact, petitioner argues that the Tax Court failed to determine when the transfer in issue took place, it being asserted that this constitutes prejudicial error.

Petitioner is correct in stating that there is no explicit finding as to the time when the transfer in exchange for stock and securities was completed. The court held that it need not determine whether the transfer be viewed as completed in April, May or December, 1952, or in April, 1953. This is true, the Tax Court stated, because even if the transfer is regarded as completed on the earliest of these dates, April 1, 1952, the equipment must be held to have been transferred in exchange for stock or securities, notwithstanding the fact that certificates of stock were not exchanged until later. This holding was premised upon the conclusion that, under the circumstances of this case, the promise made by Truck Terminals in accepting the transfer of equipment constituted in Fleetlines' hands a proprietary interest in petitioner in the nature of stock rather than a bona fide indebtedness.[3]

Petitioner does not question the legal premise last stated.[4] Assuming the validity of that premise, the Tax

3. The Tax Court said:
"* * * If the transfer is regarded as completed on April 1, 1952, the equipment was exchanged for a promise of petitioner to pay its parent $221,150. The promise was in direct proportion to the parent's proprietary interest, not actually paid according to its terms, subsequently converted to a promise to pay without provision for interest upon default or specified repayment dates, and ultimately converted into stock in petitioner. We conclude and hold, therefore, that the promise constituted in substance a proprietary interest in petitioner in the nature of stock rather than a bona fide indebtedness. * * *" 33 T.C. 876, 887.

4. It is established that promissory notes or other instruments which, on their face, are evidences of indebtedness, may be held to be "securities" within the meaning of section 112(b) (5). See R. M. Gunn, 25 T.C. 424, aff., 10 Cir., 244 F.2d 408; Gooding Amusement Co. v. Commissioner of Internal Revenue, 6 Cir., 236 F.2d 159, 164–165.

Court correctly determined that, for tax purposes, the exchange of stock or securities was effectuated on April 1, 1952, notwithstanding the fact that stock certificates were not delivered until sometime later. This being the case, it became immaterial when the last act in the complicated transaction occurred. Events subsequent to April 1, 1952 had significance only as they tended to throw light on what the parties intended at the earlier date.

Petitioner's final arguments against the finding that the transfer of equipment was made solely in exchange for stock or securities, are that the Tax Court failed to consider uncontradicted evidence, and drew factual inferences which are not reasonably warranted by the entire evidence.

We find no more merit in these arguments, as addressed to this ultimate finding, than as addressed to the other ultimate finding that the transaction was not effected by a bona fide sale and purchase.

 On the second branch of the case, petitioner argues that even if it did acquire the vehicular equipment in a transaction described in section 112(b) (5), its basis for the equipment should be the $221,150 which it purported to pay for it. This is so, it is urged, because section 113(a) (8) provides that the transferee's basis for property received in a section 112(b) (5) transaction shall be the same as it would be in the hands of the transferor ($101,030.56 in this case), increased in the amount of gain recognized to the transferor ($120,119.-44 in this case).

In following this line of argument, petitioner contends that section 113(a) (8) permits a transferee to increase its basis by the amount of gain on which its transferor actually has paid a tax, whether or not the transferor was obligated by law to pay the tax.[5] This construction of section 113(a) (8) for which petitioner contends is at odds with the Tax Court's ruling that under section 113(a) (8) a transferee may increase its basis only by the amount of gain that its transferor was required by law to recognize.[6]

For convenient reference we again quote the pertinent part of section 113 (a) (8), prescribing the procedure to be followed where a section 112(b) (5) transfer (including cases where a part of the consideration for the transfer of property to the corporation was property or money, in addition to stock or securities) has occurred:

"* * * then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under

---

5. In its 1952 income tax return Fleetlines reported the transfer of motor vehicles to Truck Terminals on April 1, 1952 as a sale of property held more than six months resulting in a capital gain of $120,119.44. Tax was paid on the gain in the sum of $31,231.05. There has been no determination of deficiency in the tax of Fleetlines for the year 1952. On December 31, 1956, after the deficiency notice which forms the basis of this litigation was served on Truck Terminals, Fleetlines filed a protective claim for refund of the $31,231.05 plus interest. Fleetlines requested that action on the claim be withheld pending disposition of the assessment against Truck Terminals.

No action was taken on the Fleetlines claim until September 30, 1958. On that date notice was given to Fleetlines by the District Director at Los Angeles that:

"The case of Truck Terminals, Inc. is now under consideration by the Applate Division of this Region. In view of the fact that agreement has not been secured in the Truck Terminals, Inc. case the claim filed by Fleetlines, Inc. is herein rejected."

Since September 30, 1958, Fleetlines' claim for refund has been held by the District Director in a suspense file pending notification of the decision to be rendered in the case now under review.

6. The Tax Court relied upon Gooding Amusement Co. v. Commissioner of Internal Revenue, 23 T.C. 408, aff. 6 Cir., 236 F.2d 159, 165, on this branch of the case. Analysis leads us to believe, with petitioner, that Gooding is not clearly in point.

the law applicable to the year in which the transfer was made."

As a statutory basis for its position, Truck Terminals argues that unless the quoted closing language of section 113 (a) (8) means gains recognized in fact by the transferor, that language serves no purpose. This is true, the argument goes, because section 113(a) (8) applies exclusively to section 112(b) (5) transactions, on which gain can never properly be recognized. Accordingly, if limited to gains recognized under a proper interpretation of law, the closing portion of section 113(a) (8) would never be called into play and so would be rendered superfluous. This superfluity could not have been intended by Congress; the statute should be construed to give operative meaning to all of its parts.

We need not, and do not decide whether, under the "recognized in law" reading of section 113(a) (8), the concluding words of that section lack operative effect.[7] Assuming this to be true, we nevertheless believe that this circumstance is outweighed by the additional circumstances referred to below.

One of these is that the concluding language of section 113(a) (8) represents an express legislative choice between the recognized in fact and recognized in law concepts, this being indicated by the words "under the law." The other is that, if petitioner's construction were to be adopted, all of section 113(a) (8) would be without practical effect. It would then always lie within the power of the controlling transferor to dictate the cost basis of property transferred to a subsidiary in a section 112 (b) (5) transaction by "recognizing" in fact a gain which section 112(b) (5) states shall not be recognized.

If Truck Terminals has misgivings concerning the ability of its parent,

Fleetlines, to obtain a refund of the capital gains tax it has erroneously paid on the transaction, it may be at ease. Fleetlines' claim for refund is in good standing and is only in suspense pending determination of the case before us. The District Director was required to note an interim rejection of the claim because of uncertainty as to the outcome of this case. But there has been no indication that the Commissioner is asserting the right to deny a high cost basis to Truck Terminals while holding Fleetlines to a capital gain which would occasion the same high basis.

The decision of the Tax Court is affirmed.

CHAMBERS, Chief Judge (concurring and dissenting).

I concur in the last part, that is, the part of the opinion which rejects petitioner's construction of 113(a) (8) of the Internal Revenue Code of 1939, whereunder it asserts that Fleetlines and Truck Terminals could close the door on the commissioner by Fleetlines' mere act of paying the capital gain tax: that thereby the issue was determined. Literally there is a lot to be said for the construction, but I do not believe the Congress intended to leave the gate that far ajar. Counsel for petitioner is to be complimented on his ingenuity.

But I have trouble upholding the recasting of the basic transaction to one of a simple exchange of Fleetlines' trucks for capital stock of Truck Terminals. Normally I would think Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218, would indicate affirmance here. But, I am troubled by a circumstance in the case, which is perhaps understandable tactics, on which neither of the parties has said very much.

In this case, in the tax court, the transaction of the "sale" of the trucks

7. It may be noted, however, that at least with respect to the "boot" provision of section 112(c) (1), a transferor in a section 112(b) (5) transaction may have a gain recognized in law. The concluding words of section 113(a) (8), would enable the transferee to take account of that gain resulting from "boot" in computing the cost basis of property acquired in that transaction.

was attacked under Section 15(c) of the Internal Revenue Code of 1939, an excess profits section in effect in 1952. By its terms, an intent to avoid excess profits was expressly made the keystone of the section. The tax court found:

"Securing the surtax exemption and the minimum excess profits tax credit was not a major purpose in the activation of petitioner or the transfer of the 78 units of motor vehicular equipment to it by Fleetlines.

"The transfer of the 78 units of motor vehicular equipment by Fleetlines to petitioner was not effected by a bona fide sale and purchase, but was made by Fleetlines solely in exchange for stock or securities in petitioner."

Elsewhere in the opinion, the tax court says on the issue of capital gains for the two companies vis-a-vis a higher cost basis for Truck Terminals to depreciate: "Petitioner has shown numerous reasons for making the transfer, but no valid business reasons independent of tax considerations for the choice of a sale as the method of transfer."

As I see it, as against Section 15(c) the tax court has impliedly said the taxpayer had valid business reasons for the transfer, but no business reasons other than saving ordinary taxes by an increased depreciation base. I have trouble with the notion that the taxpayers intended to avoid ordinary taxes but not excess profits taxes. One vitiates the other. I take it that the decision on the excess profits taxes has become final, but I feel the tax court has sort of "arbitrated" the case.

I am not unmindful that many taxpayers intend to flout the income tax law and honorably succeed in observing it and are not taxed on their intent. In other cases innocent intentions result in horrendous taxes. But here the tax court seems, in a few offhand words, to recast the transaction for ordinary taxes on the basis of taxpayers' "no valid business reasons independent of tax considerations."

In which lobe of the corporate brain would we find the intent not to avoid excess profit taxes and in which lobe would we find the intent to get capital gains and avoid ordinary income taxes? Anyway, I now better understand the meaning of "dichotomy."

It may be said that petitioner has not properly asserted the point which I make. He has not specifically pointed to it, but his general attack may cover it.

If I had two votes instead of one, I would send the case back to the tax court with a query of: Are not the findings rather inconsistent?