Edmund A. PRENTIS, Lazarus White, Charles B. Spencer, Inc., and Spencer, White & Prentis, Inc., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. Civ. 133–258.

United States District Court

S. D. New York.

April 16, 1964.

See also D.C., 273 F.Supp. 460.

findings of fact and conclusions of law, this court makes the following Findings of Fact and Conclusions of Law:

Spencer & Tunstead, New York City, for plaintiffs, Richard H. Tunstead, Austin & Diamond, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for defendant, Clarence M. Dunnaville, Stephen Charnas, Asst. U. S. Attys., of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

The plaintiffs-taxpayers Edmund A. Prentis, Lazarus White, Charles B. Spencer, Inc. and Spencer, White & Prentis, Inc. (Spencer) seek to recover $129,000 of income tax deficiencies assessed by the Commissioner of Internal Revenue. The plaintiffs paid the deficiencies and preserved their right to recover the amounts by the timely filing of claims for refund. This action presents two separate and distinct claims for refund.

The case was tried to the court without a jury. After hearing the testimony of the parties, examining the exhibits, the pleadings, the briefs and proposed

## FINDINGS OF FACT

### I. THE TAX TREATMENT OF THE TRANSACTION OF JUNE 1951 INVOLVING THE STOCK OF RIVER CONSTRUCTION CORPORATION.

1. Spencer, White & Prentis, Inc. changed its name in 1952 to Edmund A. Prentis, Lazarus White, Charles B. Spencer, Inc., and a new corporation was formed to take and use the original name. In the following items having to do with River only the original Spencer, White and Prentis, Inc. (now Edmund A. Prentis, Lazarus White, Charles B. Spencer, Inc.) is involved.

2. River Construction Corporation (River) was incorporated as a Delaware corporation on April 29, 1947. The purpose of the formation of River was to bid on the construction of Lock No. 27 on the Chain of Rocks Canal near Granite City, Illinois, an aid to the navigation of the Mississippi River for the United States Army, Corps of Engineers; and, if successful, to perform such construction project.

3. River's original stockholders and their stock subscriptions were as follows:

| | | |
|---|---|---|
| 20% Turner Construction Company | 5000 shs. at $100 | $500,000 |
| 20% Raymond Concrete Pile Company | 5000 shs. at $100 | $500,000 |
| 20% Winston Bros. Company | 5000 shs. at $100 | $500,000 |
| 20% Spencer, White & Prentis Inc. | 5000 shs. at $100 | $500,000 |
| 10% Al Johnson Construction Co. | 2500 shs. at $100 | $250,000 |
| 10% Morrison-Knudsen Company, Inc. | 2500 shs. at $100 | $250,000 |

Spencer paid $500,000 for its stock on or about June 24, 1947.

4. An agreement among the stockholders (each was a corporation) of River, dated May 1, 1947, provided, among other things, that unless River was the successful bidder on the construction project it would be dissolved, and that if it were awarded such contract it would not undertake any other project until Lock 27 was substantially completed, and then only by unanimous consent of the stockholders. The agreement also provided that each of the stockholders would be represented on the six-man board of directors, that none would sell its stock without the consent of the others, and that each stockholder would

give River, without charge, the benefit of the advice and experience of its officials. (Ex. 7)

5. On May 28, 1947, River submitted its bid for the construction of Lock 27 of the Chain of Rocks Canal to the United States Army, Corps of Engineers, in the sum of approximately $17,394,000, and was finally awarded the contract in the sum of $16,626,000. The contract, thereafter from time to time, was increased and decreased by modification until the final contract award became $17,710,866.48. Before Lock 27 was finished the United States Army, Corps of Engineers, awarded River a contract for the installation of a 54″ pipe line under the Chain of Rocks Canal. This pipe line contract, as finally adjusted, amounted to $613,873.54.

6. In June 1947, each of the six stockholders made commitments in writing to the United States Fidelity and Guaranty Co. and its co-sureties (1) to pay the amounts of their original stock subscriptions indicated above and (2) if at any time additional funds were required to finance the contract, Turner, Raymond Concrete & Pile Company, Spencer and Winston Bros. Company would each pay an additional $300,000 and Al Johnson and Morrison-Knudsen would each pay an additional $150,000 to the capital account of River.

7. The construction work for the project was performed by River under the direction of a project manager. Fred Spencer, an employee of Spencer, was the first project manager. Thereafter, in March 1950, he was replaced by Robert Dunlop. However, in addition to the project manager, representatives of the six stockholders actively aided in the project by visiting the project, counselling and advising.

8. By 1950 the stockholders realized that the construction project would incur substantial financial losses. To meet its financial requirements River borrowed substantial funds from banks and from its stockholders. Turner loaned $120,000 on March 20, 1950. This loan was repaid on July 31, 1951. Spencer also loaned $120,000 which was repaid on July 30, 1951.

9. In early 1950, Al Johnson Construction Co. and Winston Bros. Co. expressed a desire to terminate their interests in River. The other stockholders, however, were unwilling to make an agreement with Winston Bros. or Al Johnson or retire their stock for any more than it would ultimately be worth after the Lock 27 and pipe line jobs were completed and the accounts closed. At the time there were pending claims against the Army Corps of Engineers of contingent and uncertain value, and in addition the amount of the losses which would finally result on the jobs could not then be determined. (Ex. 8)

10. An agreement was finally reached whereby River agreed to redeem the Al Johnson and Winston Bros. stock for $36 per share, subject to a reduction in the redemption price equal to the retiring shareholders' pro rata share of the final losses to be incurred on the Lock 27 and pipe line jobs. (Ex. AC, pp. 31, 32) Five per cent of the agreed amount was to be paid down, and non-interest bearing, non-assignable, non-negotiable notes, subordinate to all claims and payable only upon the closing of all accounts and settlement of all of River's obligations were to be given for the balance.

The price of the stock, $36 a share, was fixed by subtracting the expected loss from the original capital stock and then adding an amount equal to the maximum conceivable amount which any of the stockholders thought could be recovered on the claims and dividing the total by the number of shares. They then added an amount for "contingent recoveries" so that there was no possibility that the stock would be worth $36 per share. (24; [1] Ex. 15)

11. In order to consummate the transaction relating to the redemption of the Al Johnson and Winston Bros. stock, River's capitalization was reduced from

---

[1]. All numerical references are to the stenographer's minutes of the trial.

$100 to $25 per share and $1,875,000 was transferred on the books from the capital stock to a capital surplus account. On December 20, 1950, Winston Bros. Co. and Al Johnson transferred to River their stock and received notes for $171,-000 and $85,500 respectively.

12. In May 1951, the remaining stockholders other than Morrison-Knudsen Company decided to withdraw in a similar manner to Al Johnson and Winston Bros. Co. On May 18, 1951, a stockholders' meeting was held and the stockholders had discussions with respect to the value to be assigned to the shares of stock, the pending claims and their validity. The stockholders then estimated that the losses would be about $1,900,000. (Ex. 15) The possibility of further losses in closing out the job and the contingent value of the claims made it impossible to reach any agreement as to a realistic fixed value of the stock. (Ex. AC, p. 20)

13. In June, 1951, the construction project was substantially complete. The major part thereof, known as Lock 27, was 96.43 per cent complete, and the remainder, known as the pipe line, was 99.2 per cent complete. (Ex. 12)

Under date of June 1, 1951, Turner and Spencer, together with Raymond Concrete Pile Company, each agreed to sell its River stock to River for $44 per share, payable $2.20 per share in cash and the balance by promissory note in a form hereinafter described. Morrison-Knudsen Company, Inc., who was to remain as the sole original stockholder of River, agreed to contribute $125,000 to River to enable River to make this purchase of its own stock. The agreement provided that the responsibility for the conduct of the affairs of River thereafter would fall entirely on Morrison-Knudsen Company, Inc., who would forthwith elect its own slates of directors and officers for River. (Ex. 16)

14. The stockholders fixed the redemption price for the stock based upon the most anybody thought could be recovered on the claims (36) using the following "assumed case for computation,"

which is set forth in the minutes of the meeting of the Board of Directors of River of June 18, 1951 (Ex. 15):

| | |
|---|---:|
| Original capital stock | 2,500,000 |
| Expected loss Lock 27 and Pipe Line | 1,900,000 |
| | $ 600,000 |
| Extra Work Orders in process not shown on books | 17,000 |
| Attorneys' valuation of claims | 85,000 |
| | $ 702,000 |
| Apparent value on liquidation 25,000 shares (original amount of stock issued) | $ 28.40 |
| Distribution $125,000 over 15,000 shares | 7.14 |
| Provision for contingent recoveries | 8.46 |
| | $ 44.00 |

By the above calculation the Board of Directors fixed a value of $44 per share. Due to the speculative claims which were included by the Board of Directors in arriving at the $44 figure, there was no factual possibility that the plaintiff's shares would be worth more than $44 per share. (36) Additionally, the $1,900,000 expected losses could not be determined with any degree of certainty since the job was still in progress. The ultimate actual loss was $2,087,900, nearly $200,-000 greater than the amount assumed. Additionally, in reaching the amount of $44 per share, the computation mistakenly assumes 25,000 shares outstanding and fails to take into account that the 7,500 shares owned by Al Johnson and Winston Bros. had, on paper, been redeemed by River. Similarly, the computation mistakenly assumes that $702,000 would be available in the capital account for distribution to shareholders, and fails to take into account that the capital account had, on paper, been reduced to $532,000 by the redemption of the Al

Johnson and Winston Bros. stock for notes and cash amounting to $270,000. Hence, at least on paper, only $532,000 was available in the capital account for distribution among the holders of 17,500 shares; the holder of each share would be theoretically entitled to approximately $24 from the capital account, or about $4 less than the $28.40 the Board of Directors of River assumed. Also, there was a mathematical error in the computation since $702,000 divided by 25,000 equals $28.08 per share rather than $28.40.

15. In June 1951, Turner and Spencer each sold all of their River stock to River for $220,000, payable $11,000 in cash on delivery of the stock and the balance by promissory note. The note provided as follows:

"FOR VALUE RECEIVED River Construction Corporation promises to pay unto Spencer, White & Prentis Inc. the sum of $209,000 at the Guaranty Trust Company, 140 Broadway, New York, New York, without interest and under the following terms and conditions:

"1. This note is executed and delivered in consideration of the sale by Spencer, White & Prentis Inc. to River Construction Corporation of five thousand (5,000) shares of the stock of River Construction Corporation, payment for which is to be made in the following manner: $11,000. upon delivery of the stock, and $209,000. as evidenced by this note.

"2. This note will be paid upon the completion of a certain contract undertaken by the River Construction Corporation, calling for the construction of Lock No. 27, Chain of Rocks Canal, Madison County, Illinois, contract No. W 23065 Eng. 1220 for the United States of America. Payment of this note will not be made unless and until the closing of all accounts for the work to be performed by River Construction Corporation under said contract and the settlement of all of its obligations therefor.

"3. When and if the aforementioned contract is completed and upon closing of accounts of said contract it shall appear that such stock, exclusive of good will, tax credits and other similar intangibles, is worth less than $220,000. based on its original capitalization less losses on said lock contract and pipe contract, plus $125,000.-00, then and in that event this note shall be reduced by a sum represented by the difference between its then so determined true worth and $220,000.

"4. This note is not assignable.

"5. The purchase of this stock by River Construction Corporation from Spencer, White & Prentis Inc. does not in any way release or discharge Spencer, White & Prentis Inc. from its obligations as more particularly set forth in a certain letter dated 6/11/47 addressed to the United States Fidelity and Guaranty Company, 100 Maiden Lane, New York 7, New York, by Spencer, White & Prentis Inc.

"6. Payment of this obligation by River Construction Corporation is subordinated and subject to any and all rights, claims or demands of the United States Fidelity and Guaranty Company, its coinsurers and reinsurers."

16. It is evident from the terms of the note that the plaintiff could receive less than the face amount of the notes if things went badly thereafter but it could never receive more than the face amount of the note if things went unexpectedly well. (174–75)

17. Payments were made from time to time on the notes, the final one being in 1957. These payments aggregated $118,134.27 to Turner and a like amount to Spencer.

18. After the sale of the stock, Turner and Spencer submitted the resignations of directorships and offices in River held by any of their representatives. The sole remaining stockholder, Morrison-Knudsen Corporation, then caused its own slate of directors and officers of River to be elected. (39; Exs. 15, 23, 24) Morrison-Knudsen also caused River to retain new

attorneys and accountants and caused River to move its main office to Fort Worth, Texas. (Exs. 25, 26) River's entire stock was thereupon divided equally between Morrison-Knudsen and a group of construction concerns in Texas who were skilled in the construction of pipe lines. (Exs. 30, AB pp. 6–14)

19. After Turner and Spencer sold their River stock they had nothing further to do with the management or operation of the Lock No. 27 project. Their only contacts thereafter were the financial reports they received showing how the job was progressing in its final stages. However, Turner and Spencer still were subject to a contingent responsibility to the bonding company until the completion of the Lock No. 27 project by River.

20. In form, Turner's and Spencer's only interest in River was as its creditors, to see that they received proper payments under their promissory notes. Morrison-Knudsen Company directed the handling of River's claims against the United States Army, Corps of Engineers, calling upon former employees of River to supply facts and figures where necessary. (Exs. 20, 22, 25, 102, 153) Morrison-Knudsen, however, would submit the decision of the Corps of Engineers respecting the various River claims to the note holders for their recommendations on acceptance of the awards or appeal. (Ex. B; 68–70)

21. In substance, Turner and Spencer still retained the same equity in River as they held as stockholders. They still could suffer additional losses and they still remained liable to the bonding companies.

22. Turner and Spencer purchased their River stock in 1945 for $100 per share. They sold their stock in 1951 for $44 per share (Ex. 16), but finally received only $23.62 per share. (188) Both Turner and Spencer took as long a term capital loss on their tax returns applicable to 1951, the difference between their investment in River stock ($500,000 each) and their 1951 sale price ($220,-000). The loss was disallowed by the Internal Revenue Service on the theory that it was a future loss and therefore not deductible until the Lock No. 27 project was completed, all accounts closed and the final payments on the notes made.

23. The plaintiff has not established that the note received in June 1951 had a fair market value for income tax purposes when received. The indefinite character of the future payments preclude attributing to the note any fair market value for income tax purposes.

24. At the time of the receipt of the note the job was not completed, the claims were undetermined and the plaintiff could possibly be called upon to contribute additional capital to River. Therefore, plaintiff has failed to prove that it suffered a realized loss in 1951 upon the exchange of its River stock for a non-negotiable contingent note. This transaction was not a closed transaction.

II. THE SALE OF THE BUSINESS AND MACHINERY BY THE OLD COMPANY TO THE NEW COMPANY.

25. In 1919, Edmund A. Prentis, Lazarus White and Charles B. Spencer organized Spencer, White & Prentis, Inc. to engage in construction work and civil engineering with emphasis on foundation and underpinning projects. The business was successful and by 1952 the founders were getting along in years and decided to allow younger associates to acquire their business. (15, 16, 76–77, 108–11) The younger group was to have a smaller stake to lose in the risky construction business than the Old Company, but they, as the New Company, were to have the benefit of the name, Spencer, White & Prentis, which had become well known. (77)

26. In June 1952, the old corporation determined to reorganize. (77) It changed its name to Edmund A. Prentis, Lazarus White and Charles B. Spencer, Inc. (Old Company) and simultaneously formed a new corporation called Spencer, White & Prentis, Inc.

(New Company), organized under the laws of New York to engage in construction work.

| | |
|---|---|
| Class A common stock— | |
| 300 shares par value $100.00 | $ 30,000.00 |
| Class B common stock— | |
| 700 shares par value at $100.00 | 70,000.00 |
| 4% cumulative participating (to the extent of 15% of net profits after income taxes) preferred stock— | |
| 100,000 shares par value $10.00 | 1,000,000.00 |
| Total authorized capital | $1,100,000.00 |

27. The New Company was organized with the following authorized capital structure:

28. Subsequent to the organization of the New Company, on June 18, 1952, the Old Company transferred to the New Company $5,800 of furniture and fixtures, $9,397.82 of prepaid insurance and $175,002.18 in cash. The Old Company also transferred its good will and prestige in addition to the jobs in progress. In return for these transfers, totalling $190,200, exclusive of good will and jobs in progress, the Old Company took 16,-020 shares of preferred stock and 300 shares of Class A common stock of the New Company. (Ex. 31)

29. On June 26, 1952, as part of the transfer of its assets, the Old Company transferred to the New Company its construction equipment and machinery and 250 shares of the common stock of Drilled-In-Caisson Corp. and took tack in exchange $50,000 cash and a six-months note for $331,112.83 due December 26, 1952 bearing interest at the rate of 3% per annum. (Ex. 31) The machinery and equipment was largely special equipment which was essential to the plaintiff's construction business. (241, 242)

30. In connection with the transfer of equipment and machinery, a conditional sales contract was entered into between the parties under the terms of which the Old Company was entitled to repossess the equipment and machinery and retain the sum of $50,000 as liquidated damages upon default by the New Company in payment of the note in the amount of $331,112.83 payable on December 26, 1952 with interest at the rate of 3% per annum.

31. Payment of the note was not made on December 26, 1952 as required by the conditional sales agreement. There is nothing to show an agreement to extend the time. On January 7, 1953, the New Company issued its check to Old Company for $331,112.83 in payment of its note. The check included only the principal amount of the note. No payment of interest was made. (Ex. 37)

32. In order to assign values to the assets being sold by the Old Company to the New Company, a committee was appointed to evaluate each piece of machinery and equipment. (80–83, 209) The committee, composed of the younger employees of the Old Company, delegated William Hughes and Harry Cowley, also employees of the Old Company, the actual task of evaluating each piece of equipment. The committee then reviewed the prices suggested by Messrs. Hughes and Cowley and determined that they were fair and reasonable. The valuation standards applied were that of a single sale of an entire inventory and they assessed a value of $381,112.81, which was modified slightly by the committee. These values were fair and reasonable.

33. Prior to June 1952, the Old Company had a staff of about 30 employees

in the office and a staff in the field whose number would depend upon the number of contracts in progress. When the New Company was formed it took over the entire office and field staff of the Old Company. (257) Since 1952 the Old Company has not performed any construction or engineering business and has not retained any employees. All it has is investments. (257–58, 261)

34. At all times prior to January 8, 1953, the Old Company owned 100% of the issued and outstanding stock of the New Company. (216; Ex. 32) During the year 1953, the New Company issued 650 shares of class B common stock to officers and key employees of the New Company. (Ex. 32) At the end of the taxable year 1953, the Old Company still owned 98.8 per cent of the stock of the New Company. (Ex. C, schedule on changes in stock holdings during the year included in tax return)

35. The key officers of the New Company were substantially the same persons as the officers of the Old Company immediately after the New Company took over the business and for several years thereafter. (149, 203, 255) The present President, Vice President and Secretary-Treasurer of the New Company are the sons of the founders of the Old Company. (253)

36. The Old Company and the New Company filed a consolidated tax return for the taxable year 1953. (Ex. C; 88) On this return the New Company claimed as a basis for depreciation the fair market value of the machinery and equipment at the time of the transfer to the New Company in June, 1952. Also, the Old Company claimed that it had made a profit on the transaction of June 26, 1952, which constituted capital gains. The Old Company used these capital gains to offset the claimed River capital loss.

37. The transfer of the machinery and equipment on June 26, 1952 was not an arm's length sale. The transfer of the machinery and equipment was a step in a plan of reorganization, the primary purpose of which was to acquire a step-ped up basis of the depreciable assets equal to their market value at the time of the transfer.

## DISCUSSION

### I. RIVER LOSS

The government opposes the deductibility of the River loss in 1951 on the basis that the transaction was not closed. In the alternative, the government contends that River consummated a recapitalization in June 1951 and that therefore the transfer of River stock by the taxpayer for cash and notes constituted a tax-free exchange within the meaning of Section 112(b) (3), Int.Rev.Code of 1939.

■■ It is elementary that a loss suffered on the sale, exchange and other disposition of property is not properly deductible from gross income unless such sale, exchange, or other disposition is a "closed transaction." In general, losses must be evidenced by complete transactions, fixed by identifiable events, bona fide and actually sustained during the taxable year claimed. However, there is an exception to the general rule that only realized losses are deductible. The exception is operative where "[i]n the case of losses which are so reasonably certain in fact and ascertainable in amount as to justify their deduction, in certain circumstances before they are absolutely realized." Commissioner v. Winthrop, 98 F.2d 74 (2d Cir. 1938); Lucas v. American Code Company, 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538 (1930).

■ Whether the rule or exception is applicable, the taxpayer has the burden of establishing that it is entitled to deduct the loss in the year claimed. Boehm v. Commissioner, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945). It is evident that the transaction in June 1951 involving the redemption of plaintiff's stock was not closed and completed since the plaintiff did not know and could not determine what its loss would be. The construction was not complete, claims of uncertain amounts were pending and additional losses in completing the project could not

be predicted with any degree of certainty. The amount of the final loss could not be ascertained as of June 1951 and the amount actually received in 1957 was nearly 100% less than the agreed price of $44 per share.

The taxpayer contends that the sale of stock to River in 1951 fixed the maximum amount that it might receive for its stock. Therefore, plaintiff urges, it sustained a deductible loss in 1951 in the amount of the difference between its acquisition cost ($500,000) and $220,000, the sales price. The taxpayer further contends that the subsequent failure of River to pay full purchase price of the stock merely created further losses to the plaintiff which were not known until 1957. It is apparent, therefore, that the taxpayer is attempting to satisfy the requisites of a closed transaction by saying that the $280,000 loss on the sale of the stock in 1951 was closed since it set both a minimum loss figure and a maximum value to the notes. Therefore, the taxpayer argues that the element of uncertainty relates only to the final value of the note and not to the difference between the original subscription price ($500,000) and the sales price ($220,-000).

■■■ This position of the taxpayer is untenable. While there is nothing wrong with a taxpayer attempting to decrease the amount of his taxes or altogether avoid them by means which the law permits, "[t]he question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). Equally appropriate in determining the issue before the court is the principle "[w]hether the transaction under scrutiny is in reality what it appears to be in form." Johnson v. Commissioner, 86 F.2d 710, 712 (2d Cir. 1936).

■ Here, the sale was fictitious. The price of $44 per share was ill-suited to the economic realities of the situation.

Although the "sale" of the stock in form divorced the plaintiff from River as a stockholder, in reality it did not. Plaintiff cannot avoid the fact that its ultimate loss upon the closing of the accounts on the Lock No. 27 project would be identical whether it calls itself a creditor of River or a stockholder of River. The fact that River under the direction of Morrison-Knudsen acquired new stockholders does not alter the fact that for the present purposes the sale by plaintiff to River was fictitious since the new stockholders and River, with the exception of Morrison-Knudsen, had nothing to do with the Lock No. 27 project. Therefore, it is clear that plaintiff is attempting not only to regulate the timing of its loss but also is trying to split one loss into two. This is clearly prohibited by Section 23(f) since it did not sustain a loss during the taxable year 1951. The 1951 sale of River stock falls far short of the requirements of Treas.Reg. 111, § 29.23(e)–1, which states: "In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses."

On the basis of the foregoing it is unnecessary to discuss the government's alternative position.

## II. THE TRANSACTION OF JUNE 26, 1952

While it may be that the transfer of machinery and equipment from the Old Company to the New Company was a matter of "form" and not "substance," it is assumed for the present purposes that there was a transfer in substance. However, the taxpayer has the burden of establishing that Section 112(b) (4) or Section 112(b) (5) does not apply and that the transaction of June 26, 1952 constituted a taxable event in which gain

or loss is recognized under the Internal Revenue Code.[2]

Section 112(b) (4) provides that no gain or loss shall be recognized if a corporation, a party to a reorganization, exchanges property pursuant to a plan of reorganization, solely for stock or securities. Section 112(b) (5) also provides for non-recognition of gain or loss if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control of the corporation. Here, there is no question but that the Old and New Companies were parties to a reorganization. Section 112(g) (2). It is also clear that as of January 7, 1953, the Old Company owned 51,020 shares of preferred stock in the New Company and 300 shares of Class A common stock which was 100% of the issued stock as of that date. (Ex. 26) During the period from January 8, 1953 through December 31, 1953, only 650 shares of Class B common stock were issued to individuals. This was only 1.2% of the New Company's stock. (Ex. C) Therefore, the record clearly establishes that the Old Company controlled the New Company within the meaning of Section 112(h) in January 1953.

Since the Old Company and the New Company were parties to a reorganization and that immediately after the transfer of machinery and equipment the Old Company owned more than 30% of the stock in the New Company, the only question remaining in order to determine if Section 112(b) (4) or (b) (5) is applicable is whether the machinery and equipment were transferred wholly in exchange for the stock or securities of the New Company within the meaning of the Code. Crucial to this determination is the question, whether the transfer of equipment was a step in an integrated transaction constituting a reorganization or a separate and distinct transaction.

Although the Code and regulations do not define a "step transaction," the term itself is self-defining—that is, a series of closely related components taken to achieve an end result. Various courts have used a number of tests in determining the existence of a step transaction. See, e. g., American Bantam Car Co., 11 T.C. 397, 405. Basically, the intent of the parties, timing, ultimate result and mutual interdependence of the transactions, constitute the tests.

In the present case the intent of the parties is clear. The parties intended that the New Company would take over the entire construction business of the Old Company, lock, stock and barrel. The timing was also consistent with a "reorganization." The assets were transferred about a week after the organization of the New Company and used immediately. The ultimate result of the transaction is obvious. The Old Company transferred its construction business to the New Company together with the assets necessary for the conduct of the business. The reorganization was not complete until the machinery and equipment had been transferred. The machinery and equipment were absolutely essential to the operation of the new business and the success of the reorganization. Therefore, it is clear that the transfer of the machinery and equipment was a crucial part of a step transaction consisting of the changing of the name of the Old Company and the organization of the New Company with the Old Company's previous name; the issuance of stock of the New Company and the transfer of all the issued stock to the Old Company and the receipt by the New Company of cash and notes; and, finally, the transfer of the machinery and equipment.

The fact that cash passed hands in the purchase of the machinery and equipment is of no significance since the Old Company supplied the cash with which the New Company allegedly purchased the equipment. The Old Company in "sub-

---

**2.** All Code sections referred to are sections of the Internal Revenue Code of 1939.

stance" did not make a profit by this transaction. It was a wash transaction. Aqualane Shores Inc. v. Commissioner, 269 F.2d 116 (5th Cir. 1959). See also Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428 (1932). "Transitory phases of an arrangement frequently are disregarded under these [reorganization] sections of the revenue acts where they add nothing of substance to the completed affair," and when "they are no more than intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan." Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 184, 185, 62 S.Ct. 540, 544, 86 L.Ed. 775 (1942). "The purpose of the statute was to prevent those interested in property from stepping up its basis by a change in the form of ownership, when there had been no change in fact." Republic Steel Corporation v. United States, 40 F.Supp. 1017, 1022, 94 Ct.Cl. 476, (1941). See also Bard-Parker Company v. Commissioner, 218 F.2d 52 (2d Cir. 1954), cert. denied 349 U.S. 906, 75 S.Ct. 582, 99 L.Ed. 1242 (1955). In sum, plaintiff has failed to prove that the transfer of machinery and equipment on June 26, 1952 was not an integral part of a non-taxable step transaction under Section 112(b) (4) or Section 112(b) (5) and that pursuant to Sections 113(a) (7) and (a) (8) the claimed gain on the transaction is recognized.

The plaintiff argues that even if it is established that the transaction of June 26, 1952 was a step in a non-taxable exchange, the transaction involved "boot" and the gain must be recognized to the extent of such "boot" under Section 112 (c). A good example of a "boot" is where a taxpayer exchanged, in connection with a reorganization, a share of stock in the "X" company purchased by him for $100 for a share of stock in "Y" company, worth $80, together with $30 in cash. The gain from the exchange, $10, is recognized and taxed, since it is realized by the receipt of cash, while the stock-for-stock transaction is not recognized. See also Commissioner v. Estate of Bedford, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611 (1945). In the present case, the Old Company did not exchange stock for stock and "boot." Therefore, the facts of this case do not present a "boot" situation and Section 112(c) is inapplicable.

Plaintiff also argues that if the exchange of June 26, 1952 should be considered as part of a step transaction involving the formation of the New Company on June 18, 1952, the New Company is entitled to a stepped up basis because the six-month's note is not a security within the meaning of Sections 112(b) (4) and 112(b) (5), citing Commissioner v. Sisto Financial Corp., 139 F.2d 253 (2d Cir. 1944) and Lloyd-Smith v. Commissioner, 116 F.2d 642 (2d Cir.), cert. denied 313 U.S. 588, 61 S.Ct. 1111, 85 L.Ed. 1543 (1941). This contention of the taxpayer is clearly untenable.

As stated in Aqualane Shores Inc. v. Commissioner, supra; "The controlling consideration in determining whether the obligations of a corporation given by it as the recited consideration for the transfer of property are to be regarded as representing purchase money or as a security received in a Section 112 exchange 'is an overall evaluation of the nature of the debt, degree of participation and continuing interest in the business, the extent of proprietary interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc.' " Camp Wolters Enterprises, Inc. v. Commissioner, 230 F.2d 555 (5th Cir.), cert. denied 352 U.S. 826, 77 S.Ct. 39, 1 L.Ed.2d 49 (1956); Truck Terminals, Inc. v. Commissioner, 33 T.C. 876 (1960), aff'd 314 F.2d 449 (9th Cir. 1963). Here, there is no doubt that an overall evaluation of the transactions of June 1952 yield the conclusion that the promissory note given by the New Company to the Old Company was a security within the meaning of Sections 112(b) (4) and (b) (5).

**460**

CONCLUSIONS OF LAW

I.

1. This court has jurisdiction over this action by virtue of 28 U.S.C. § 1346.

2. The surrender by plaintiff of its stock and the simultaneous receipt of $11,000 in cash and River's note, which did not bear interest, was not assignable, was subordinate to the sureties, and final payment was contingent upon the net worth of River at the completion of the contract, was not a closed transaction for income tax purposes. Estate of Marshall, 20 T.C. 979. Plaintiff's money was still tied up in the River Construction Corporation although the evidence of its investment was changed from stock to a contingent note.

3. Plaintiff has not sustained its burden of proof in establishing that loss claimed in 1951 was properly deductible in 1951. Section 23(f), Int.Rev.Code of 1939; Weiss v. Wiener, 279 U.S. 333, 49 S.Ct. 337, 73 L.Ed. 720 (1929); Estate of Chester W. Cuthell, 3 TCM 313 (1944); Dresser v. United States, 55 F.2d 499 (Ct.Cl.1932), cert. denied 287 U.S. 635, 53 S.Ct. 85, 77 L.Ed. 550.

II.

4. The taxpayer has the burden of proving that the transaction of June 26, 1952 involving the transfer of the machinery and equipment to the New Company was a sale.

5. All of the various maneuvers conducted by the Old Company and the New Company were steps in a single transaction whereby the Old Company exchanged machinery, equipment and other property necessary for its construction business to the New Company which was organized to take over the Old Company's business in return for stock of the Old Company. American Bantam Car Co., 11 T.C. 397.

6. The transfer of the machinery and equipment was not a sale but a non-taxable exchange within the meaning of Sections 112(b) (4) and (b) (5) of the Internal Revenue Code of 1939.

7. The plaintiff is not entitled to the stepped up basis. Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942); Portland Oil Co. v. Commissioner, 109 F.2d 479 (1st Cir. 1940); Survaunt v. Commissioner, 162 F.2d 753 (8th Cir. 1947).

Defendant's Exhibit 1 accompanying Government's Exhibit AC is not admissible in evidence.

The defendant is entitled to judgment dismissing the complaint with costs.

Settle judgment on notice.