Catalina Homes, Inc. v. Commissioner.
Catalina Homes, Inc. v. Commissioner
Docket No. 3431-62.
United States Tax Court
T.C. Memo 1964-225; 1964 Tax Ct. Memo LEXIS 114; 23 T.C.M. (CCH) 1361; T.C.M. (RIA) 64225; August 25, 1964
Jack S. Fuchs, 475 5th Ave., New York, N. Y., for the petitioner. Arthur S. O'Neill, Jr., for the respondent. FAY
Memorandum Opinion FAY, Judge: Respondent determined a deficiency of $13,757.02 in the income tax of petitioner, *116 Catalina Homes, Inc., for its fiscal year ended December 31, 1959. The principal issue for decision is whether petitioner, during said fiscal year, qualified as a "small business corporation" as that term is defined in section 1371. [1] Respondent apparently concedes that if petitioner were found to qualify under section 1371, it would not, pursuant to section 1372, be subject to the taxes imposed by chapter 1 of the Internal Revenue Code of 1954. In the event we decide petitioner did not so qualify under section 1371, we must determine whether certain amounts paid by petitioner to two of its stockholders as interest were actually dividends not deductible from its gross income. All of the facts have been stipulated, are so found, and are incorporated herein by this reference. Those necessary to an understanding of our inquiry are recited below. Petitioner was incorporated on September 23, 1958, under the laws of the State of New York for the purpose of engaging in the business of real estate development, generally, and, more specifically, in *117 the business of constructing and selling one-family homes. It filed a U.S. Small Business Corporation Return of Income for its taxable year 1959 with the district director of internal revenue, Brooklyn, New York. Petitioner's authorized capital stock consists of 200 shares of no-pair common stock. On October 1, 1958, Frank I. Spano (hereinafter referred to as Spano) paid $10,000 to petitioner, in return for which petitioner issued 100 shares of such stock to Spano and certain of his relatives, as follows: Relationship to
No. of Shares
Shareholder
Spano
Received
Spano
51
Salvatore Spano
son
10
May Spano
wife
19
Raymond Spano
son
5
Joseph Spano
son
5
Frances Spano
daughter
5
John and Cath-
son-in-law and
erine Fremgen
daughter
5
Total
100 (The record does not indicate whether the shares of stock received by Spano's wife and children were gifts from him or whether any part of the $10,000 advanced to petitioner by Spano included funds belonging to his wife and children.) These are the only shares of stock ever issued by petitioner. On January 27, 1959, petitioner, pursuant to the provisions of section 1372, timely filed an Election *118 by Small Business Corporation whereby it elected not to be subject to the taxes imposed by chapter 1 of the Internal Revenue Code of 1954. On February 11, 1959, 35 shares of stock in petitioner were transferred to Spano by members of his family, as follows: No. of
Shares
No. of
Trans-
Shares
Shareholder
ferred
Remaining
Salvatore Spano
6
4
May Spano
17
2
Raymond Spano
3
2
Joseph Spano
3
2
Frances Spano
3
2
John and Catherine Fremgen
3
2
Total
35
14 (The foregoing individuals will hereinafter be referred to, collectively, as Spano's wife and children.) The record does not indicate whether the transferors received any consideration for their shares. On the same date Spano sold 35 shares of stock in petitioner to one George Blackshaw (hereinafter referred to as Blackshaw) for $3,500 and various mutual undertakings hereinafter described. Blackshaw filed a timely consent to the above-mentioned election filed by petitioner pursuant to section 1372. In connection with the foregoing sale of stock to Blackshaw, the following agreements were executed on February 11, 1959: (1) A shareholder agreement among Spano, Blackshaw, and Spano's *119 wife and children, wherein various term and conditions were set forth concerning the management of petitioner, the transferability of their stock and the proportionate sharing of losses sustained by any of them as a result of guarantying loans made to petitioner. (2) A voting trust agreement wherein Spano's wife and children gave to Spano, as voting trustee, the exclusive right to vote their stock for a period of 10 years from the date thereof. (3) An agreement between Spano, as the owner of 51 shares of petitioner's no-par common stock and the voting trustee of an additional 14 shares, and Blackshaw, as the owner of the remaining 35 outstanding shares of stock in petitioner, which set forth, in some degree of specificity, various conditions and terms by which they agreed to be bound as stockholders in petitioner. In pertinent part hereto, the agreement between Spano and Blackshaw provided: THIRD: FRANK I. SPANO agree that in addition to the stock which he owns in the CORPORATION [petitioner], that he will lend to the CORPORATION, either in cash or by the transfer of assets to the CORPORATION, as he has already done, a total sum of $45,500.00 FOURTH: GEORGE BLACKSHAW agrees *120 that in addition to the stock which he owns in the CORPORATION, that he will lend to the CORPORATION the sum of $24,500.00 FIFTH: The said loans shall bear interest at the rate of 5% per annum and interest shall be payable from time to time, as determined by the Board of Directors. SIXTH: Dividends shall be paid by the CORPORATION, only after and until all corporate debts have been paid; all loans made by the CORPORATION and personally guaranteed by FRANK I. SPANO and GEORGE BLACKSHAW have been repaid in full and all loans made by FRANK I. SPANO and GEORGE BLACKSHAW to the CORPORATION have been repaid with interest. Repayment by the CORPORATION on loans made by FRANK I. SPANO and GEORGE BLACKSHAW shall be in proportion to the amounts of said loans. On February 11, 1959, petitioner issued a new stock certificate for 51 shares to Spano. On that same date Spano's wife and children transferred their certificates of stock in petitioner to Spano who, in turn, surrendered them to petitioner. Petitioner issued a certificate for 14 shares to Spano as voting trustee. On July 22, 1959, Blackshaw transferred to his son 34 of the 35 shares that Blackshaw had purchased from Spano. The record *121 does not indicate whether Blackshaw gave this stock to his son as a gift or sold it to him. Contemporaneously therewith, Blackshaw's son entered into a voting trust agreement with Blackshaw under which the son gave his father, as voting trustee, the exclusive right to vote the 34 shares of stock for a period of 10 years. On the same day Blackshaw surrendered these 35 shares of stock to petitioner, and in return was issued a new stock certificate for 1 share bearing his name and another stock certificate for 34 shares issued to him as voting trustee. Blackshaw's son filed a timely consent to petitioner's election under section 1372. As of December 31, 1958, petitioner's books reflected a capital stock account in the amount of $10,000 and an account payable to Spano in the amount of $10,560. This account payable was opened on petitioner's books on December 22, 1958, when Spano transferred to petitioner a piece of land which he had purchased on August 27, 1958, for $47,520, subject to a mortgage of $36,960. The balance of $10,650 was set up on petitioner's ledgers as a loan payable to Spano. As of December 31, 1959, petitioner's books reflected loans payable to Spano and Blackshaw *122 in the respective amounts of $45,500 and $24,500. In addition to the $10,560 advanced to petitioner as a result of the land transfer on December 22, 1958, Spano advanced the remaining $34,940 to petitioner, as follows: (1) Spano advanced a total of $11,240 in cash to petitioner between January 31, 1959, and February 28, 1959. (2) Spano spent $3,900 on January 2, 1959, in connection with the purchase of a model house for petitioner. This amount was entered on petitioner's books as a loan from Spano. (3) On August 27, 1958, Spano purchased a piece of land for $40,654.41, subject to a mortgage of $31,680. On February 13, 1959, Spano, in a transaction which he treated as a sale, transferred the land to petitioner for a total of $51,480, less the amount of the mortgage, $31,680, to which the land was still subject. The balance of $19,800 was credited on petitioner's books as a loan payable. The account payable to Blackshaw arose by virtue of his cash advance to petitioner on February 28, 1959, in the amount of $24,500. These accounts payable to Spano and Blackshaw were not evidenced by a note or other evidence of indebtedness. There was no maturity date for the repayment of *123 these advances. Nor were they secured. During 1959 petitioner paid $2,268.12 to Spano and $1,064.62 to Blackshaw, or a total of $3,332.74, with respect to their respective advances to petitioner in the amounts of $45,500 and $24,500. These amounts were treated as interest payments by petitioner, Spano, and Blackshaw. As of December 31, 1959, petitioner had borrowed from various banks a total of $93,600 in building loans secured by mortgages. Approximately $68,640 of these funds was used by petitioner to satisfy the mortgages on the two pieces of property Spano transferred to petitioner. The balance was used to meet other construction costs. The following is a comparative balance sheet reflecting petitioner's assets and liabilities as of the beginning and end of its taxable year 1959: Beginning of
End of Tax-
ASSETS
Taxable Year
able Year
Cash
$ 1,248.26
$ 67,514.82
Inventory
61,887.13
135,695.47
Deposits Receivable
50.00
50.00
Exchanges
30.00
50.00
Funds in Escrow
5,355.00
Buildings and Other Fixed Depreciable Assets
$610.00
Less: Accumulated Amortization and De-
preciation
101.67
508.33
Model House
14,000.00
17,000.00
$77,215.39
$226,173.62
LIABILITIES AND CAPITAL
Accounts Payable
$ 35,613.38
Bonds, Notes, Mortgages Payable (Short Term) to: Deposits Payable
$10,870.00
14,275.00
Accrued Expenses
995.46
Accrued Taxes
475.39
989.78
Bonds, Notes and Mortgages Payable (Long
Term) to: Banks
8,350.00
93,600.00
Others
36,960.00
Shareholders
10,560.00
70,000.00
Capital Stock
10,000.00
10,000.00
Shareholders' Undistributed Taxable Income
700.00
Total Liabilities and Capital
$77,215.39
$226,173.62
*124 For the year 1959, petitioner had taxable income in the amount of $33,700. Although petitioner did not declare a formal dividend during that year, it did, nevertheless, distribute $33,000 of this amount to its shareholders with respect to their stockholdings. [2] As a result of this distribution, petitioner was left with what it believed to be undistributed taxable income in the amount of $700 for that year. (Cf. section 1373(a), (b), and (c)). [3]
*125 Respondent, pursuant to statutory notice of deficiency dated June 6, 1962, determined that petitioner did not qualify as a "small business corporation" as defined in section 1.1371-1(a), Income Tax Regs., and that petitioner was, therefore, subject to the tax on corporations provided in section 1.11-1, Income Tax Regs.
It is respondent's position, in essence, that petitioner failed to qualify, during 1959, as a "small business corporation" as that term is defined in section 1371(a)[4] because (1) it had more than one class of stock (section 1371(a)(4)) and/or (2) it had as shareholders persons who are not individuals (section 1371(a)(2)). Respondent contends that the advances by Spano and Blackshaw to petitioner, in fact, constituted a second class of stock. Respondent buttresses that argument by reference to his regulations defining classes of stock under section 1371. In pertinent part, these regulations provide: "If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock." Respondent *126 also claims that when Blackshaw's son and Spano's wife and children, respectively, placed their shares of no-par common stock into voting trusts, because of the concomitant suspension of their voting rights, a new class of stock was created. Respondent bases that argument upon the portion of his regulations which provides: If the outstanding shares of stock of the corporation are not identical with respect to the rights and interest which they convey in the control, profits, and assets of the corporation, then the corporation is considered to have more than one class of stock. Thus, a difference as to voting rights, dividend rights, or liquidation preferences of outstanding stock will disqualify a corporation. * * * [Sec. 1.1371-1(g), Income Tax Regs.] *127 Respondent also contends that, contrary to the provisions of section 1371(a)(2), petitioner had as shareholders persons who are not individuals, namely, the two voting trusts for the shares of stock owned by Blackshaw's son, on the one hand, and by Spano's wife and children, on the other. Respondent grounds this contention upon section 1.1371-1(e) of the Income Tax Regulations which provides: (e) Shareholders must be individuals or estates. A corporation in which any shareholder is a corporation, trust, or partnership does not qualify as a small business corporation. The word "trust" as used in this paragraph includes all trusts subject to the provisions of subchapter D, F, H, or J (including subpart E thereof), chapter 1 of the Code and voting trusts. Thus, even though the grantor is treated as the owner of all or any part of a trust, the corporation in which such trust is a shareholder does not meet the qualifications of a small business corporation. It is petitioner's position (1) that it had no more than one class of stock outstanding at all times relevant *128 hereto and (2) that, since a voting trust is not a taxable entity, Blackshaw's son and Spano's wife and children, rather than the voting trusts, should treated as shareholders in petitioner for purposes of section 1372(a)(2). Aside from making these general contentions, petitioner has adduced little support for its position. In contending that the amounts shown on petitioner's books as indebtedness owed to Spano and Blackshaw were, in fact, capital contributions constituting a second class of stock, respondent relies upon a number of the standard criteria developed and utilized by the courts for purposes of distinguishing whether a particular investment in a corporation constitutes a capital or equity investment, rather than a loan. [5] There have been numerous decisions involving whether purported sales or loans were, in fact, contributions to capital, and various criteria have been pointed out as guidelines in the determination of whether the transaction, in substance, is what it purports to be in form. The name given to the instrument, if any, is not conclusive but is to be considered along *129 with the other facts. The presence or absence of a maturity date for the indebtedness, the right of the creditor to enforce the payment of principal and interest, participation in management, whether the creditor subordinates his debt to those of the other corporate creditors, whether the corporation is adequately capitalized, identity of interest between creditor and stockholder, whether the advance was made at the time of the organization of the corporation, and the ability of the corporation to obtain loans from outside sources are among the factors which, depending upon the context in which they are found, may be indicative of whether the amounts advanced have been placed at the risk of the business as capital or are genuine loans. Respondent points out that each case must be decided on the basis of its own facts, and no one of the above criteria takes precedence over the others. See John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). *130 In our opinion, for purposes of the question now before us, some of the more pertinent criteria relied upon by respondent as indicating that the amounts advanced by Blackshaw and Spano [6] to petitioner were capital contributions rather than loans are: (1) The fact that the amounts advanced were not represented by notes or any other evidence of indebtedness and did not have a fixed maturity date (cf. Commissioner v. Schmoll Fils Associated, 110 F. 2d 611 (C.A. 2, 1940), reversing 39 B.T.A. 411 (1939)); (2) interest on amounts advanced by Spano and Blackshaw was not payable in any event, but was to be paid only as determined by petitioner's board of directors (cf. Hoguet Real Estate Corporation, 30 T.C. 580, 598-599 (1958), and Wetterau Grocer Co. v. Commissioner, 179 F. 2d 158, 160 (C.A. 8, 1950), affirming a Memorandum Opinion of this Court; and (3) the inadequacy of petitioner's formal capital at its inception as compared to the amount permanently needed by it in the conduct of its business. Furthermore, all of the advances by Spano and Blackshaw were made to petitioner within a period of approximately 3 to 5 months from *131 the date of its incorporation. See Isidor Dobkin, 15 T.C. 31, 33-34 (1950), affd. per curiam 192 F. 2d 392 (C.A. 2, 1951), where this Court made certain remarks which are equally applicable to the circumstances now before us: When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. * * * The chances that the so-called loans would be repaid depended upon the earnings of the corporation. Because of the limited amount attributed to capital on the corporate books, any attempt by petitioner or one of his associates to enforce payment of the demand notes would probably have rendered the corporation insolvent, and such attempted payment would have come within the ban of New York stock corporation law [McKinney's Consolidated Laws of New York Annotated, Book 58, Art. 3, § 15] forbidding repayment of loans from stockholders *132 when a corporation is insolvent or when its insolvency is imminent. * * * There is no evidence in the record that Spano or Blackshaw ever demanded, or contemplated demanding, repayment of their purported loans. Moreover, whatever evidence is available suggests that the advances were part of the capital of the corporation. Thus, in 1959 when petitioner had taxable income of $33,700, it distributed $33,000 of this amount to the holders of its no-par common stock in accordance with their stockholdings. The fact that petitioner distributed its earnings in this manner suggests to us that these funds were not needed in its business. Therefore, the fact that *133 petitioner did not use these amounts to retire, in part, the purported loans from Spano and Blackshaw is a further indication that their advances represented permanent investments in petitioner in the nature of equity contributions. These various factors suggest that Spano and Blackshaw placed their advances to petitioner at the risk of its business. The question of whether shareholder advances to a corporation should be treated as equity contributions or genuine loans is essentially a fact question in which the burden of proof is on the petitioner. Matthiessen v. Commissioner, 194 F. 2d 659, 661 (C.A. 2, 1952), affirming 16 T.C. 781 (1951); Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 at 165 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031 (1957). In the situation now before us petitioner makes several arguments as to why the advances by Spano and Blackshaw to petitioner should be treated as loans rather than a second class of stock. Petitioner's first argument is that in treating *134 the amounts of $45,500 and $24,500, respectively, invested in it by Spano and Blackshaw as loans, it was not seeking to obtain an interest deduction for what, in fact, were nondeductible dividends. In other words, petitioner claims that as a qualified corporation making the subchapter S election, the interest deduction at the shareholder level would be of no tax benefit to it or its shareholders. Its position is that since there is no tax on the corporation the same amount of taxes would be paid whether the amounts paid with respect to these shareholder advances were considered interest or dividends. Petitioner's reason for this statement is that the same persons, namely the shareholders of the corporation, would receive these amounts and report them as ordinary income whether such amounts be considered interest or dividends. Petitioner's point would seem to be that there was no element of tax avoidance present in the designation of the advances by Spano and Blackshaw as loans. Cf. Nassau Lens Co. v. Commissioner, 308 F. 2d 39 (C.A. 2, 1962), remanding 35 T.C. 268 (1960), where the Court of Appeals noted: *135 Tax savings motives are, of course, not irrelevant and may be considered by the Tax Court. They may not, however, be given conclusive effect but should be given weight commensurate with the extent to which "they contribute to an understanding of the external facts of the situation." * * * In short, a departure from normal business patterns combined with a tax avoidance motive usually will be sufficient to justify treating the "loan" as equity. Either factor alone, however, is not enough. [308 F. 2d 39, at 47]
Petitioner's argument is valid, at least to the extent it goes. However, aside from the matter of interest deductions, petitioner has failed to establish that both it and its shareholders were free of other tax avoidance motives in designating their advances as loans. (See footnote 5 setting forth various issues that have arisen under the various provisions of the Internal Revenue Code, other than the issue of deductibility of interest payments, where the designation of shareholder advances to their corporation may result in tax avoidance.) Petitioner also contends that the advances on open account made by Spano and Blackshaw were disproportionate to their *136 stockholdings in petitioner and that this indicates that such advances were not capital contributions but were, in fact, genuine loans. We have found as a fact that Spano made advances on open account to petitioner totalling $45,500 and owned 51 percent of the outstanding stock in petitioner in his own name and was voting trustee of another 14 percent beneficially owned by members of his family. We have also found that Blackshaw made advances on open account to petitioner in the amount of $24,500 and owned 1 percent of the outstanding stock of petitioner in his own name and was voting trustee of another 34 percent of petitioner's stock owned by his son. Respondent contends that the advances by Spano and Blackshaw were proportionate to their stockholdings. He bases this contention on the argument that Spano should be treated as the owner of 65 percent of the outstanding stock in petitioner and Blackshaw the remaining 35 percent. Respondent does not specifically set forth his grounds for this argument, and it is not clear whether he is treating the transfers of stock by Spano and Blackshaw to members of their respective families as sham transactions (cf. Hoguet Real Estate Corporation, supra) *137 or whether he is relying upon the applicability of the rules of constructive ownership in section 318 or section 544. Cf. Rev. Rul. 59-187, C.B. 1959-1, 224. We need, not, however, decide this question. The existence of proportionality between the amount of shareholder advances and the percent of stock owned by the shareholders is merely, in some circumstances, [7] an indication that the advances have, in fact, been placed at the risk of the business and actually constitute capital contributions (cf. Gilbert v. Commissioner, 248 F. 2d 399, 407 (C.A. 2, 1957), remanding a Memorandum Opinion of this Court). Under the circumstances before us, it is of no significance whether the advances by Spano and Blackshaw were proportionate to their stockholdings; for respondent, in the instant situation, has called our attention to other factors indicating that their advances were placed at the risk of the business. *138 On the basis of the foregoing, it is our opinion (1) that none of petitioner's arguments or any combination of them is sufficient to rebut the inferences arising from the foregoing criteria relied upon by respondent and (2) that petitioner has failed to carry its burden of proof as to whether the advances by Spano and Blackshaw constituted equity contributions. Therefore, we conclude that these advances were contributions to capital. With regard to the question whether these advances constituted a second class of stock, respondent has called our attention to the stockholders' agreement between Spano and Blackshaw and specifically to two provisions thereof which provide, in effect: (1) That their advances to petitioners would bear a return of five percent "payable from time to time as determined by [petitioner's] Board of Directors," and (2) that these advances were preferred over the no-par common stock to the extent that dividends could not be paid on the no-par common stock until the advances by Spano and Blackshaw, plus the five percent return thereon, had been paid in full. On the basis of these provisions, it appears to us that advances from Spano and Blackshaw were *139 preferred over the no-par common stock and thus constituted a second class of stock for purposes of section 1371(a)(4). Cf. Jewel Tea Co. v. United States, 90 F. 2d 451 (C.A. 2, 1937). For this reason petitioner failed to constitute a small business corporation during 1959 as that term is used in section 1371. Because of our determination on the first issue herein, it will not be necessary for us to consider respondent's contentions that (1) the shares of stock in voting trusts constituted a second class of stock because of their loss of voting power, and (2) the voting trusts are to be considered shareholders of petitioner so as to disqualify it under section 1371(a)(4). However, we do deem it appropriate to note our reservations as to whether these arguments represent a reasonable interpretation of the applicable statutory provisions and the intent of Congress in enacting subchapter S. Finally, in view of our findings on the first issue herein, we conclude that the monies paid by petitioner to Spano and Blackshaw with regard to their advances to petitioner, in the respective amounts of $2,268.12 and $1,064.62, constitute dividends and not interest. Therefore, petitioner *140 may not deduct such amounts from its taxable income for the year 1959. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as it existed during the year in issue.↩
2. The parties have stipulated: "The petitioner did not declare dividends from its incorporation until its dissolution several years subsequent to the taxable year." The record, however, contains other evidence to indicate that during the year 1959 petitioner did distribute earnings in the amount of $33,000 to its shareholders, with respect to their stockholdings. We, therefore, interpret the abovequoted portion of the stipulation of facts to mean that petitioner did not formally declare any dividends, but it did in fact make distributions to its shareholders which, under the income tax laws, constitute dividends. ↩
3. SEC. 1373. CORPORATION UNDISTRIBUTED TAXABLE INCOME TAXED TO SHAREHOLDERS. (a) General Rule. - The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) Amount Included in Gross Income. - Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation. (c) Undistributed Taxable Income Defined. - For purposes of this section, the term "undistributed taxable income" means taxable income (computed as provided in subsection (d)) minus the amount of money distributed as dividends during the taxable year to the extent that any such amount is a distribution out of earnings and profits of the taxable year as specified in section 316(a)(2)↩.
4. SEC. 1371. DEFINITIONS. (a) Small Business Corporation. - For purposes of this subchapter, the term "small business corporation" means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not - (1) have more than 10 shareholders; (2) have as a shareholder a person (other than an estate) who is not an individual; (3) have a nonresident alien as a shareholder; and (4) have more than one class of stock.↩
5. These criteria have been developed by the courts to determine whether, in substance, a transaction is what it purports to be in form or appearance. The purpose of such analyses is to prevent tax avoidance under various provisions of the Internal Revenue Code. The courts have often found it necessary to make such analyses and apply such criteria in connection with the following issues: (1) Whether payments by a corporate taxpayer are deductible interest or constitute nondeductible dividends (cf. Wilber Security Co., 31 T.C. 938, 948-952 (1959), affd. 279 F. 2d 657 (C.A. 9, 1960)); (2) whether payments by a corporation are deductible as the cost of goods sold or constitute nondeductible dividends (cf. Sherwood Memorial Gardens, Inc., 42 T.C. 211 (1964)); (3) whether a corporation realizes income upon the cancellation of notes given by the corporation to a shareholder in return for money advanced to the corporation (cf. J. A. Maurer, Inc., 30 T.C. 1273 (1958)); (4) whether amounts advanced to a corporation by a shareholder are to be considered bona fide indebtednesses for purposes of the bad debt deduction (cf. American-LaFrance-Foamite Corporation v. Commissioner, 284 F. 2d 723 (C.A. 2, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 365 U.S. 881 (1961)); and (5) whether amounts paid by a corporation to an investor are to be treated by him as repayments of a bona fide loan or as dividends (cf. Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031↩ (1957)).
6. The accounts payable reflected on petitioner's books in the respective amounts of $10,560 and $19,800, arising in connection with Spano's transfer of two pieces of land to petitioner, represent investments in, or advances to, petitioner just as much as his advances of cash. This is true regardless of whether Spano sold the land to petitioner or contributed it to petitioner's capital; for in forging his right to receive payment of such amounts from petitioner, Spano clearly made an investment in, or advances to, petitioner.↩
7. We do not believe that proportionality between shareholder advances and the percentage of stock owned, or the existence of shareholder agreements to maintain such proportionality, is in every case necessarily indicative that the funds advanced or to be advanced are being placed at the risk of the business and, therefore, constitute capital contributions. Colony, Inc., 26 T.C. 30, 43 (1956), affd. 244 F. 2d 75 (C.A. 6, 1957), reversed on other issue 357 U.S. 28 (1958); and Leach Corporation, 30 T.C. 563↩ (1958).