236 F.2d 159
 56-2 USTC P 9808
 GOODING AMUSEMENT COMPANY, Incorporated, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
F. E. GOODING, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Anna Elizabeth GOODING, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
F. E. GOODING and Elizabeth Gooding, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 12574-12577.
 United States Court of Appeals Sixth Circuit.
 Aug. 1, 1956.
 
 Roger K. Powell, Columbus, Ohio, for petitioners.
 Grant W. Wiprud, Washington, D.C., H. Brian Holland, Ellis N. Slack, Washington, D.C., on briefs, for respondent.
 Before SIMONS, Chief Judge, and MARTIN and McALLISTER, Circuit Judges.
 MARTIN, Circuit Judge.
 
 
 1
 These four tax reviews, involving transactions among F. E. Gooding, his wife Anna Elizabeth Gooding, and his controlled corporation, Gooding Amusement Company, were consolidated for hearing and resulted in decisions by the Tax Court of the United States that there are deficiencies in income tax, varying in amounts as to the respective parties, relating to the years 1947, 1948 and 1949, in the aggregate amount of $65,663.88.
 
 
 2
 The findings of fact and opinion of the tax judge were reviewed by the tax court. Many facts were stipulated and embraced in the findings. The tax court received in evidence the testimony of the taxpayer, F. E. Gooding, and that of a certified public accountant, Edmund c. Redman. A review of the findings of fact deemed pertinent to decision will be undertaken; but we shall not incorporate the several mathematical tabulations contained therein, or otherwise indulge in unnecessary detail.
 
 
 3
 In late December of 1932, F. E. Gooding organized a corporation to lease and operate merry-go-rounds, ferris wheels, and like amusement devices, which were owned by him individually. This corporation was dissolved on December 31, 1942. During 1942, petitioner employed as tax consultant a certified public accountant who has been associated with his business since that time.
 
 
 4
 On January 1, 1943, F. E. Gooding formed a partnership with his wife and their one-year-old daughter under the name and style of 'F. E. Gooding Amusement Company.' Gooding gave his wife two-sevenths' interest and his baby daughter a one-seventh interest in the partnership, retaining for himself the remaining four-sevenths' interest therein. The petitioners accepted the determination of the Bureau of Internal Revenue that the infant daughter was not a bona fide partner for income tax purposes. Accordingly, her one-seventh interest in the partnership was taxed to her father for the years 1943 to 1946, inclusive. Gooding sold the amusement devices and portable rides to the partnership, which operated them rent free. The partnership carried public liability insurance to the extent of $50,000, which Gooding considered as going 'a long way' toward covering any liability which might arise from accidents in the operation of the property of the partnership. The largest accident claim ever paid amounted to $18,000. The net taxable yearly income of the partnership from January 1, 1943, to August 24, 1946, ranged from $151,000 to $257,000, approximately.
 
 
 5
 On August 24, 1946, a corporation known as 'Gooding Amusement Company, Incorporated,' was organized, the officers being F. E. Gooding, President and Treasurer; Elizabeth Gooding (his wife), Vice-President; and Kathleen Holleran, Secretary. At the close of business on that date, the Gooding partnership distributed to its three partners-- as tenants in common in respective moieties of four-sevenths to F. E. Gooding, two-sevenths to his wife, and one-seventh to his infant daughter-- assets of the partnership consisting of accounts and notes receivable, land, buildings, cables, canvas, electrical, trucking, and office equipment, electrical towers, mechanical rides, unexpired insurance, advance payments on equipment, and advances to employees. The book value of the assets so distributed was $177,037.29; and the book value of the undistributed cash investments, land and accrued interest of the partnership was $285,745.84. Each partner, in proportion to his or her respective undivided interest in the distributed assets, assumed a joint and several obligation to pay certain notes executed by the partnership in the total amount of $13,969.25. The capital account of each partner was proportionately reduced on the books, with the effect that the net total distribution was $163,068.04, which was equivalent to the book value of the assets distributed, less the notes payable assumed.
 
 
 6
 The partnership remained in existence throughout the entire period involved in this litigation. Included in the assets distributed to the partners were depreciable assets, whereof nearly $130,000 consisted of trucking equipment and mechanical 'rides.'
 
 
 7
 Concurrently with the distribution of the partnership assets of the book value of $177,037.29, the partners made an offer to the newly formed corporation, Gooding Amusement Company, to exchange the aforementioned distributed assets at a valuation of $294,970.39. The difference between the depreciated book value of the distributed assets and the amount offered came to $117,933.10. This represented the difference between the book value of the trucking equipment and mechanical rides and the fair market value of such assets as appraised by Gooding with the help of Kathleen Holleran, secretary of the corporation. In arriving at the new valuations, Gooding surveyed the equipment and rides in use on the various locations, checked inventory records, and consulted with his foremen concerning the condition of the equipment and rides. The new corporation assumed the partnership notes, amounting to $13,969.25, the payment of which had previously been assumed by the three partners.
 
 
 8
 In return for the foregoing assets amounting by net balance to $281,001.14, transferred and conveyed to the corporation, the three partners received in proportion to their respective partnership interests corporate shares of no-par value and corporate notes of the Gooding Amusement Company. F. E. Gooding received 140 shares having a stated value of $28,000 and five notes due in five succeeding years (beginning in 1947) of $26,514.42 each, totalling $132,572.08; Elizabeth Gooding received 70 shares having a stated value of $14,000 and five notes due in five succeeding years (beginning in 1947) of $13,257.20, for a total of $66,286.04; and the infant daughter, Joyce Ann Gooding, received 35 shares having a stated value of $7,000 and five notes due in five succeeding years (beginning in 1947) of $6,628.60 each, totalling $33,143.02. The portion of the assets contributed for the shares and that contributed for the notes was not identified. The corporate notes were ordinary negotiable instruments, each containing an unconditional promise to pay at a fixed maturity date the principal promised, together with interest at five per cent per annum. The notes to the infant daughter were made payable to 'F. E. Gooding as natural guardian of Joyce Ann Gooding.' Though the name 'Gooding' was of established value in the outdoor amusement filed, no goodwill value was ascribed to it on the books of either the partnership or the corporation. The sum of $184,444.23 in cash was left in the partnership among its non-operating assets totalling $285,745.84. The corporation received no cash whatever from the partnership.
 
 
 9
 Each partner reported for the taxable year 1946, as a long-term capital gain, his or her proportionate share of the difference between the depreciated cost of the transferred assets and the amount at which such assets were offered to and accepted by the corporation. The individual petitioners paid a total tax of $28,683.27 on these long-term capital gains, which the Commissioner of Internal Revenue accepted.
 
 
 10
 The corporation used as the unadjusted basis of the trucking equipment and mechanical rides acquired from the partnership on August 24, 1946, the increased valuation assigned to them by Gooding. Between August 24, 1946, and December 31, 1952, the corporation sold about fifteen per cent of its trucking equipment and fifty-seven per cent of its mechanical rides acquired from the partnership on August 24, 1946. The corporation acquired new equipment and rides at a total cost of $306,894.27 during 1947. For the acquisition of additional equipment in 1947 and in later years, and in connection with its operation, the corporation obtained funds and credits evidenced by notes from banks, merchants, the partnership, the petitioner, and the Gooding infant. These notes payable amount in 1947 to $138,572.08; in 1948 to $186,018.92; and in 1949 to $246,149.40. During 1947, the partnership and Gooding's infant daughter advanced to the corporation the additional sum of $23,000, whereof $17,000 was outstanding at the close of both years 1947 and 1948; and $14,000 was outstanding at the close of 1949.
 
 
 11
 By agreement of date December 20, 1946, certain key employees of the corporation, in consideration of corporate shares issued to them, gave the corporation an option to repurchase the shares at any time at progressively increasing prices, beginning with $220 per share in 1947 and ending with $400 per share in 1956, at the close of which latter year the option would expire unless extended by mutual consent. At the end of 1947, the employees had acquired approximately twenty-five per cent of the corporation's outstanding stock. As of December 1953, the corporation had paid Mrs. Gooding only $5,000 on the series of five notes of $13,257.21 each issued to her by the corporation; and had made no payments on the series of five notes of $6,628.60 each payable to the infant daughter. The corporation still owed F. E. Gooding two notes of $26,514.41 each. All the unpaid notes payable to the Goodings were long past due. F. E. Gooding had been paid by the corporation three notes of $26,514.42 each for the reason, stated by him, that, unlike his wife and daughter, he needed money for investment in an apartment house.
 
 
 12
 We come now to a controversial and crucial finding of fact by the tax court. This finding was, as follows: 'The principal amount of the other notes issued August 24, 1946, was not paid because the corporation was heavily indebted to outsiders and at no time during the period involved had a sufficient cash balance. Petitioner, who as president and majority stockholder controlled the corporation, subordinated the claims of himself and his family to those of banks and other third parties. Petitioner felt that such subordination was necessary in order to maintain the corporation's credit standing. Petitioner and his family at no time had any intention of enforcing their matured claims against the corporation.'
 
 
 13
 Petitioners urge that there was no subordination of their notes by any written or oral agreement; but, at most, only permission by the noteholders that payment of their obligations be deferred for the time being and that other existing creditors be actually paid before them. They point out that Gooding testified that collection of their notes was not enforced on the due dates, for the reason that they wanted the corporation to pay its outside bills promptly to preserve a good credit rating; and that the payment of the obligations to his family could be put off without inconvenience.
 
 
 14
 Contrariwise, the tax court reasoned in its opinion that it could not ascribe to F. E. Gooding an intention at the time of the issuance of the notes ever to enforce their payment, especially if to do so would impair the credit rating of the corporation, or cause it to borrow from other sources the necessary funds to pay the notes to him and his family, or bring about the dissolution of the corporation. Its opinion pointed out that a realistic appraisal of the family situation could lead only to the conclusion that petitioner's wife and infant daughter never contemplated acting independently of, or contrary to, Gooding's wishes in respect of the enforcement or disposition of their corporate notes. It was asserted that the fact that most of the notes have not been paid, though long since matured, lends corroboration to the court's finding that at no time did the family noteholders intend to enforce payment of their notes or to assert the rights of bona fide creditors. The state of mind of the family noteholders was considered to be akin to that of an ordinary shareholder who understands that his investment is subject to the risk of the venture, and to the prior claims of creditors. The tax court added: 'The incidence here of the subordination of the Goodings' notes to the claims of others is too marked to permit us to find that a bona fide debtorcreditor relationship was established between the corporation and its controlling stockholders.'
 
 
 15
 The tax court found that there had not been established between the corporation and the individual members of the Gooding family the relationship of debtor-creditor in respect of the issuance of the corporate notes to them as of August 24, 1946; and that the payments made by the corporation to the individual petitioners in 1947 and 1948 on the principal of their notes were essentially equivalent to taxable dividends under section § 115(a) of the Internal Revenue Code, 26 U.S.C.A. 115(a). The tax court held, moreover, that the accruals and payments on the notes issued by the corporation to the Goodings did not constitute interest on indebtedness under section 23(b) of the Internal Revenue Code, 26 U.S.C.A. § 23(b), and therefore were not deductible from the gross income of the corporation, Gooding Amusement Company.
 
 
 16
 The further holding of the tax court was that the property acquired by the corporation in exchange for its stock in the foregoing notes was acquired in a transaction described in section 112(b)(5), Internal Revenue Code, 26 U.S.C.A. § 112(b)(5), wherein no gain or loss is recognized under the law applicable to the year in which the transfer was made; and that the basis of the transferred property is the same as it was in the hands of the transferors and may not be increased by the amount of gain which was in fact recognized through error and on which Gooding, his wife, and infant daughter paid a capital gains tax. The case was considered just another in a long series wherein the stockholders of a closely held corporation have attempted to establish between themselves and the corporation the relationship of creditor-debtor. The companion cases, John Kelley Co. v. Commissioner of Internal Revenue, and Talbot Mills v. Commissioner of Internal Revenue, 326 U.S. 521, 698, 66 S.Ct. 299, 90 L.Ed. 278, were cited as principal authority. It is true that the principle of Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, may have been controlling in decision of the two cases cited; and the Dobson case no longer has the same force which it once had, in view of U.S.C.A., Title 26, § 1141(a). Nevertheless, the courts must still give appropriate consideration to the superior opportunity enjoyed by the trier of facts to judge the credibility of witnesses and to draw inferences from their testimony.
 
 
 17
 It was pointed out by the tax court that the courts have been careful not to lay down any all-embracing rule of general application in deciding each case upon its own peculiar facts but have invoked and relied upon certain criteria, none of which, of itself, is determinative of the ultimate fact question. It was said that, while the instruments involved in the instant case present in form pure evidence of indebtedness, substance must always prevail over form; and that all surrounding circumstances to determine the real intention of the parties must be considered.
 
 
 18
 The court rejected the argument of Gooding that he desired that he and his family should become substantial creditors on the same basis as other unsecured creditors, inasmuch as should a disastrous accident occur with the ensuing heavy liability he and his family would, as creditors, be able to salvage some portion of the corporate assets, which they could not salvage if they were merely stockholders. The destructive answer to this argument was that, at the end of 1942 when the risk of massive liability for accidents was no less than in 1946, Gooding changed his form of doing business from that of a corporation to that of a partnership.
 
 
 19
 The tax court reasoned, moreover, that the corporation's liability insurance in 1948 and 1949 was $50,000/200,000, an insurance carriage considerably in excess of that of the partnership and more than adequate to cover any claim which might reasonably have been expected to arise out of an accident. The stark fact was stated to be that the only substantial purpose motivating Gooding was tax avoidance. The conclusion was repeated that no indebtedness, in the meaning of section 23(b), Internal Revenue Code, arose between the Goodings and the corporation; and, there being no such indebtedness, that the accruals could not represent interest.
 
 
 20
 Upon the same reasoning, the tax court concluded that, inasmuch as the notes did not in reality represent creditor interests, the payments made to the stockholders who held the notes must be deemed not to be payments of a bona fide indebtedness of the corporation but as a distribution of corporate profits to the stockholders, as such, and not as creditors. Accordingly, the payments constituted dividends under the broad coverage of section 115(a) of the Internal Revenue Code. The language of the United States Court of Appeals in McGuire v. Commissioner of Internal Revenue, 7 Cir., 84 F.2d 431, 432, was quoted: 'Neither artifice, subterfuge, nor bad faith need be present to bring a transaction within the meaning of the statute here involved, for as we read the law a taxpayer may well act with the utmost good purpose and without evil intent and yet his transactions may in effect be the equivalent of the distribution of a taxable dividend.'
 
 
 21
 Finally, the tax court rejected the contention of the petitioner corporation that the exchange involved did not fall within the ambit of section 112(b)(5) but on the contrary was a transaction taxable in part under section 112(c)(1) of the Code of 1939, and that therefore the basis of the assets so transferred to the corporation includes, pursuant to section 113(a)(8), Internal Revenue Code of 1939, the amount of gain thus recognized. The tax court thus replied to this argument: 'Such conclusion is a non sequitur, with which we disagree. As a condition precedent to the application of section 113(a)(8), supra, it is first necessary that compliance be had with the section 112(b)(5) requirement. That is to say, the property involved must have been acquired by the corporation by issuance of stock '* * * in connection with a transaction described in section 112(b)(5). * * *' Since we have found hereinabove that the notes which were received by petitioners and which by them are claimed to represent '* * * other property * * *' under section 112(c)(1), were in fact representative of risk capital invested in the nature of stock, the '* * * solely in exchange for stocks or securities * * *' requirement of section 112(b)(5) was, in our considered judgment, satisfied. Furthermore, immediately after the exchange the transferors were in control of the transferee corporation, and the stock which they received was in proportion to their interests in the property prior to the exchange. Thus, in our opinion, the exchange involved was a so-called section 112(b)(5) transaction, as a result of which no gain or loss should have been recognized.' It was stated that the court had no alternative to the denial of the stepped-up basis sought by the petitioner corporation.
 
 
 22
 We agree with the assertion in McGuire v. Commissioner of Internal Revenue, supra, that there are many holdings of the courts wherein distributions have been held not to be taxable and many other holdings where distributions have been held to be taxable; and that most of the authorities are of little value in the determination of a particular case, for the reason that 'each depends for its solution upon its own peculiar facts,' to be determined in the light of all the surrounding circumstances. See also Washmont Corporation v. Hendricksen, 9 Cir., 137 F.2d 306, 308; Wetterau Grocer Co. v. Commissioner of Internal Revenue, 8 Cir., 179 F.2d 158; Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 132 F.2d 182, 185. This being true, we think that no good purpose would be served by entering upon a review of the decided cases relating to the instant subject matter. For correct understanding, the facts of each case would need to be stated at some length. We think a bare citation of some of the leading cases will suffice.
 
 
 23
 In the following listed cases, distributions by the respective corporations were held to fall within the classification of dividends rather than that of interest; or advances to the corporation by principal stockholders were held to be contributions to capital and not loans to the corporation. First Mortgage Corporation of Philadelphia v. Commissioner of Internal Revenue, 3 Cir., 135 F.2d 121; Wetterau Grocer Co. v. Commissioner of Internal Revenue, 8 Cir., 179 F.2d 158; Matthiessen v. Commissioner of Internal Revenue, 2 Cir., 194 F.2d 659, 661; Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 132 F.2d 182; Grace Bros. v. Commissioner of Internal Revenue, 9 Cir., 173 F.2d 170; John Wanamaker Philadelphia v. Commissioner of Internal Revenue, 3 Cir., 139 F.2d 644.
 
 
 24
 In the following listed cases, the reverse was true and the corporate distributions were held to be in the nature of interest rather than possessing attributes of dividends; or advances to the corporation by stockholders were held to be loans to the corporation and not contributions to capital. Bowersock Mills & Power Co. v. Commissioner of Internal Revenue, 10 Cir., 172 F.2d 904 (one judge dissenting); Earle v. W. J. Jones & Son, 9 Cir., 200 F.2d 846; Washmont Corporation v. Hendricksen, 9 Cir., 137 F.2d 306; Rowan v. United States, 5 Cir., 219 F.2d 51; Helvering v. Richmond, F. & P. R. Co., 4 Cir., 90 F.2d 971; Wilshire & Western Sandwiches, Inc., v. Commissioner of Internal Revenue, 9 Cir., 175 F.2d 718; Cf. Commissioner of Internal Revenue v. O.P.P. Holding Corporation, 2 Cir., 76 F.2d 11; Commissioner of Internal Revenue v. Page Oil Co., 2 Cir., 129 F.2d 748.
 
 
 25
 A study of the foregoing authorities impels the thought that no rule of thumb may be derived from them, but that each particular case must be adjudicated upon its own facts. The same underlying principles are recognized in the foregoing authorities, irrespective of the divergent results reached. It is obvious that the correct application of the fundamental principles is often difficult.
 
 
 26
 This court, in United States v. Title Guarantee & Trust Co., 6 Cir., 133 F.2d 990, 996, affirmed the judgment of the district court that payments on certain certificates designated as preferred stock should be treated as interest payments on indebtedness and not as dividends on stock and were therefore properly deductible from gross income for tax purposes pursuant to Title 26, section 23, U.S.C.A. There were three separate opinions. The majority opinion pointed out that the decisive factor, in determining whether a relationship of debtor-creditor had been established or whether a stockholder relationship has been shown, depends upon the real intention of the parties. Such intention may be established by evidence aliunde. It was stated that the cases are in agreement to the effect that the decisive factor is not what payments are called, but what they are, in fact. A fixed maturity date was said to be the most significant factor toward determining the existence of a debtor-creditor relationship. It was recognized that the findings of fact of the district court are presumptively correct and in the absence of challenging the evidence cannot be questioned on appeal. The concurring opinion rested upon this proposition. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A., was invoked in the opinion of the concurring judge: 'In the absence of the evidence upon which the court made its findings we are unable to say that they were clearly wrong.' The opinion of the dissenting judge asserted: 'In my judgment the opinion and the findings of fact demonstrate that the taxpayer did not sustain the burden of showing that these payments were regarded by the parties as interest upon a debt. The contention of the Government that the findings of fact do not support the court's conclusions of law should therefore be sustained.'
 
 
 27
 It is accepted doctrine that the findings of fact made by the tax court, unless clearly erroneous, should not be set aside on review by courts of appeals. Rule 52(a) of the Federal Rules of Civil Procedure is applicable to the findings of the tax court. The courts of appeals have jurisdiction to review decisions of the tax court in the same manner and to the same extent, insofar as the facts are concerned, as the appellate courts have to review decisions of the district courts in civil actions tried without juries. Omaha National Bank v. Commissioner of Internal Revenue, 8 Cir., 183 F.2d 899, 902, 25 A.L.R.2d 628; Grace Bros. v. Commissioner of Internal Revenue, 9 Cir., 173 F.2d 170, 173; Earle v. W. J. Jones & Son, 9 Cir., 200 F.2d 846; Matthiessen v. Commissioner of Internal Revenue, 2 Cir., 194 F.2d 659, 662. Particularly applicable here is the succinct saying of the Supreme Court in United States v. Yellow Cab Co., 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150: 'Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them.'
 
 
 28
 Upon the entire record in the case and upon application of the principles of the authorities heretofore cited, we are of opinion that the findings of fact of the tax court are supported by substantial evidence and are not clearly erroneous, and that its conclusions were appropriately drawn.
 
 
 29
 The decision of the tax court in each of the four cases under review is, accordingly, affirmed.
 
 
 30
 McALLISTER, Circuit Judge (dissenting).
 
 
 31
 The sole issue in this case is whether the notes executed by the corporation to petitioners constituted an indebtedness of the corporation. It is conceded that the corporation received full value in property for the notes. The price was fair. The notes are straight promissory notes. They were always reflected on the books of the corporation as indebtedness; and they were always reflected as indebtedness upon any financial statement given out for any purpose. Interest was accrued and paid each year upon the unpaid notes. Several of the notes were paid prior to the time the Commissioner indicated that he would not recognize the notes as indebtedness.
 
 
 32
 It is said by the Tax Court that the subordination of petitioners' notes to the claims of others is too marked to permit a conclusion that the notes constituted a bona fide indebtedness. Yet there was never any subordination, in a legal sense, of the notes to the claims of others. The fact that the Goodings temporarily withheld enforcement of their claims as creditors in order to assist the company in difficult times is not a circumstance that should be considered as depriving them of their standing as creditors. They had the right to share equally with other creditors, and their forebearance does not change their status. Petitioner corporation borrowed considerable money from the banks, but the corporation always showed petitioners' notes as an indebtedness when it borrowed. The banks and all creditors who relied upon the corporation's financial statement were informed that the corporation was indebted on these notes. If the banks repeatedly loaned money to the corporation, recognizing these notes to be an outstanding indebtedness, at the time; if the creditors extended credit to the corporation, knowing that these notes were carried as an indebtedness at the time such credit was extended; and if the stockholders and the corporation itself recognized these notes as a real and bona fide indebtedness, I am unable to see how the Tax Court could find that the corporation and the holders of such notes never intended them to be an indebtedness of the corporation. Such findings, in my view, are without any support in the evidence; and I am unable to see that there is any evidence from which reasonable inferences could be drawn that the parties did not intend that the notes should create a bona fide indebtedness. In fact, all of the evidence supports the conclusion that it was intended that the notes be executed in payment for the property conveyed, and that they were intended to constitute a bona fide indebtedness of the company.
 
 
 33
 In my opinion, the decision of the Tax Court was clearly wrong, and should be reversed.