Charles W. Williams Contracting Company, Inc. v. Commissioner.Charles W. Williams Contracting Co. v. CommissionerDocket No. 5659-64.United States Tax CourtT.C. Memo 1966-93; 1966 Tax Ct. Memo LEXIS 189; 25 T.C.M. (CCH) 500; T.C.M. (RIA) 66093; April 29, 1966Edward A. Johnston, 301 N. Charles St., Baltimore, Md., for the petitioner. Robert E. Garfield and David T. Link, for the respondent. DAWSONMemorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency in petitioner's income tax for the taxable year ended February 28, 1962, in the amount of $44,265.84. The only issue*190 for decision is whether advances of funds by petitioner to Charles W. Williams & Associates, Inc., were loans so as to permit petitioner to deduct the amount of $106,500 as a bad debt, or whether such advances should be treated as capital contributions. Petitioner concedes by stipulation that, if we disallow the claimed bad debt deduction, it had income for the taxable year ended February 28, 1962, which is subject to the personal holding company tax imposed by sections 541 through 547, Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts, together with exhibits attached thereto, are incorporated herein by this reference. The petitioner, Charles W. Williams Contracting Company, Inc. (hereinafter sometimes called Contracting) is a corporation organized on March 23, 1961, under the laws of the State of Virginia with its principal office at Hamstead, Maryland. It keeps its books and files its tax returns on the accrual method of accounting and on a fiscal year basis. Contracting filed a Federal corporation income tax return for its taxable year ended February 28, 1962, with the district*191 director of internal revenue at Baltimore, Maryland. Charles W. Williams & Associates, Inc. (hereinafter called Associates) is a corporation organized on June 1, 1954, under the laws of the State of Maryland. Associates also filed its Federal corporation income tax returns with the district director of internal revenue at Baltimore, Maryland. The entire capital stock of Associates consisted of five shares, with a total capitalization of $5, owned solely by Charles W. Williams (hereinafter called Williams). Williams was president of both Contracting and Associates during the period here involved. The principal business activity of Contracting was renting construction equipment. The principal business activity of Associates was general contracting, primarily road and bridge construction. In November 1959, Associates obtained a contract for $2,375,332 to build a road in Bristol, Virginia. The surety bond on this job was furnished by Continental Casualty Company. On September 2, 1959, Associates had obtained a loan from the Small Business Administration (hereinafter sometimes called SBA) to help finance the Bristol job. Before Associates could start construction activities, it had*192 to purchase further road building equipment for approximately $500,000. Associates, with limited working capital, purchased the road building equipment under conditional sales contracts. Associates was unable to meet its conditional sales contract payments on the construction equipment. Consequently, part of the equipment was repossessed. In January 1961, Associates was unable to obtain any bonds for future construction work because there were contingent liabilities pending against the corporation in excess of $300,000 and its working capital position was weak. Williams then personally organized Contracting as a construction corporation to do work in the State of Virginia. Contracting was formed on the assumption that it, as a new corporation, would be able to obtain bonding for new construction jobs. Williams transferred to Contracting personal securities with an approximate value of $150,000 in exchange for 100 percent of its stock. The original capital stock of Contracting, consisting of 15,000 shares issued and outstanding, was originally held by Williams and subsequently transferred by gift to other members of his family as follows: No. ofStockholdersSharesCharles W. Williams1,500Elizabeth D. Williams4,500(wife of Charles W. Williams)Walter D. Williams4,500(son of Charles W. Williams)Charlas W. Wise4,500(daughter of Charles W. Williams)Total shares15,000*193 The personal securities of Williams transferred to Contracting by April 1, 1961, in exchange for Contracting's stock were sold as follows: April 27, 1961$ 48,256.14June 27, 196116,557.82July 31, 196149,512.29February 20, 196223,319.72Total$160,965.69Several months after the organization of Contracting, Williams had Associates transfer two groups of equipment to Contracting under a contract of sale dated June 7, 1961, stated to be effective as of April 1, 1961. The first group of property (Group A) was carried on the books of Associates at a total depreciated value of $132,215.19. All of this property was subject to the SBA mortgage securing the $250,000 SBA loan which then had an outstanding balance of approximately $202,000. The second group of property (Group B) was being leased by Associates with options to purchase. The agreement between Associates and Contracting stated that Associates was arranging for the leases to be changed into conditional contracts of sale. The agreement further provided that the Group B property would have been carried on the books of Associates at a book value of $69,850.44 if it had been subject to conditional contracts*194 of sale rather than leases. 1 The total "book value" of these two groups of property was approximately $202,000 at the time of the transfer. As payment for the equipment, Contracting, with the agreement of the SBA, assumed the $202,000 balance of the loan owed by Associates to the SBA. 2 Although all the property was purportedly sold with Contracting assuming the $202,000 balance of the SBA loan, Associates retained the liability for paying the remainder of the purchase price still due on the equipment in Group B. This further liability of Associates was approximately $39,000. 3*195 On the same day that Contracting and Associates entered into their contract of sale, they also entered into a lease agreement stated to be effective as of April 1, 1961. Under this agreement Contracting agreed to lease to Associates for 5 years all the road building equipment it had just purchased from Associates for a monthly rental of $6,000 plus all maintenance, insurance, taxes, etc. At the organizational meeting of Contracting held March 27, 1961, Williams was elected president of the corporation. As president, he was authorized to endorse and guarantee loans made to Associates, to pledge Contracting's security as collateral for such loans, and "to make direct loans to Charles W. Williams & Associates, Inc." At the second meeting of the board of directors of Contracting, held April 1, 1961, Williams was authorized to execute the contract of sale between Associates and Contracting. By the end of July 1961 Contracting had loaned $58,500 to Associates. At the third meeting of the board of directors of Contracting, held August 1, 1961, Williams advised the board that Contracting had already loaned Associates $58,500 and requested and obtained authority to loan Associates a further*196 $41,500 to complete their Bristol, Virginia, contract, to extend the already overdue loans made to Associates until the end of the job, and to approve the agreement already drafted which would implement all this. The official minutes of the meeting contain the following statement: The Chairman [Williams] advised that in his opinion it should be possible for Charles W. Williams and Associates, Inc. to complete their contract with this loan, and that they then should be able to repay their loan in full. [Emphasis supplied.] By October 30, 1961, Contracting had loaned Associates an additional $48,000, bringing the total then to $106,500. The advances from Contracting to Associates and the repayment of these advances were as follows: Moneys Ad-Datevanced4-27-61$20,000.005- 4-618,000.005-17-612,000.005-25-611,000.005-29-618,000.006- 1-611,500.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,000.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,000.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,000.009-26-618,000.0010-30-611,000.00Balance as of 2-28-62$106,500.00Repayment ofAdvances5- 1-62$ 2,389.20 *5-29-626,200.00 *5-31-62208.99 **7-26-6224,201.81 ***$ 33,000.00Balance as of 2-28-6373,500.00*197 Contracting's advances to Associates from April 27, 1961, through July 25, 1961, are represented by seven "notes." The first was due in 60 days while the other six were due in 30 days. The "notes" state that they are with interest from date but do not state the amount of such interest. No interest or principal has ever been paid on these "notes" and they were never called. If Contracting had called the "notes" at any time, it would have forced Associates into bankruptcy. The "notes" were not secured by any collateral. The last of this series of "notes" was for $18,000 and is dated July 25, 1961, at which time both principal and interest on all of the previous "notes" were totally in arrears. On August 1, 1961, Contracting and Associates entered into an "AGREEMENT AND CHATTEL DEED OF TRUST" which acknowledged that Contracting had already advanced $58,500 to Associates on a series of "notes"; that it was anticipated that Associates would need an additional $41,500 in the next 6 months; and that Associates had*198 entered into certain lease-purchase agreements on which Associates had paid $180,784.35 and still owed $92,788.67. It then provided that in consideration of Contracting agreeing to forego the collection of all of the above "notes" until the completion of the contract then being performed by Associates, and for the additional loan of $41,500, Associates would pledge to Contracting all of its right, title, and interest in the equipment subject only to the prior rights of the lessors-vendors of the equipment. 4 The collateral pledged by Associates to Contracting could not have been sold because it was subject to a lien of the vendor-lessor and a lien of the SBA. Consequently, Contracting's recourse, if Associates had become bankrupt, would have been to pay the substantial balances owed to machinery companies and the SBA after having lost its only source of income, the $6,000 monthly rental provided by Associates. *199 Contracting and Associates were unable to acquire another work bond from Continental Casualty Company or any other bonding company. Early in 1962, Associates had defaulted on its work contract with the State of Virginia because of inadequate working capital and inability to obtain any further bonding for new jobs which would provide the needed working capital. Associates then proceeded to turn over all its debts and accounts receivable with regard to the job to the surety, Continental Casualty Company. In its Federal corporation income tax return for its fiscal year ended February 28, 1962, Contracting reported the creation of a reserve for bad debts and a receivable and reserve position in the following manner: Accounts and notes receivable$140,505.13Less: Reserve for bad debts106,500.00$ 34,005.13 This return also reported a capital gain of $76,079.36 from the sale of securities transferred to Contracting by Williams. The Federal corporation income tax returns of Associates showed a deficit in earnings of $70,688.32 as of May 31, 1960, and a deficit in earnings of $63,186.18 as of May 31, 1961. In his notice of deficiency dated August 25, 1964, the*200 respondent determined that the "claimed business bad debt deduction in the amount of $106,500 is not an allowable deduction under the provisions of section 166 or any other section of the Internal Revenue Code of 1954." Ultimate Findings 1. No outside investor would have made the advances of funds to Associates without adequate security which Associates itself was unable to provide. 2. The advances of Contracting to Associates were made without normal creditor safeguards. 3. Contracting did not attempt to enforce its rights against Associates to recover the advances because to have done so would have put Associates out of business. 4. The advances made by Contracting were placed at the risk of the business of Associates. Opinion Section 166(a), Internal Revenue Code of 1954, provides that there shall be allowed as a deduction any debt which becomes worthless within the taxable year. Section 166(c) provides that, in lieu of any deduction under subsection (a), there shall be allowed a deduction for a reasonable addition to a reserve for bad debts. The pertinent provision of the regulations is section 1.166-1(c) which reads as follows: Bona fide*201 debt required. Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166. The fact that a bad debt is not due at the time of deduction shall not of itself prevent its allowance under section 166. Whether advances to a corporation should be treated as capital contributions or bona fide loans is one of fact, with the petitioner having the burden of proof. Matthiessen v. Commissioner, 194 F. 2d 659 (C.A. 2, 1952), affirming 16 T.C. 781 (1951); Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031 (1957). While various objective criteria are used by the courts in resolving the issue, the answer turns essentially on whether a true debtor-creditor relationship existed or was intended. The form of the transaction is not controlling but rather the substance. As the Court of Appeals said in*202 United States v. Title Guarantee and Trust Co., 133 F. 2d 990, 993 (C.A. 6, 1943): The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. [Emphasis in original.] Although this case does not involve the usual situation where a stockholder makes advances to his corporation, the same objective criteria are nevertheless determinative of whether the advances between corporations controlled by the same individual constitute capital contributions or loans. Our ultimate findings are dispositive of the issue here. Under these particular circumstances we regard the advances made by one wholly-controlled corporation to another as equity rather than debt. It is clear that the debtor corporation, Associates, was in a weak financial position. It could not have obtained financing from an outside investor because of the lack of adequate collateral*203 with which to secure a loan. The advances were made by Contracting without regard to normal creditor safeguards. The security hypothecated was almost negligible in value. No effort was made by Contracting to enforce the payment of the obligations because to have done so would have forced the debtor into bankruptcy. Cf. Gilbert v. Commissioner, 262 F. 2d 512, 514 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court. Even Williams admitted that Associates could have repaid Contracting only if it could have obtained more work and more bonding. Respondent, in a well-documented brief, has referred us to many cases relating to this question. We have considered them as well as the cases cited by petitioner. However, we think no useful purpose will be served by engaging in an extensive discussion of the authorities. As we have said before, the issue is factual. On this record we are persuaded that a true debtor-creditor relationship did not exist between Associates and Contracting. Therefore, we sustain the respondent and hold that the advances were capital contributions. This conclusion makes it unnecessary for us to consider respondent's alternative contentions. *204 Decision will be entered for the respondent. Footnotes1. Group B appears to be that portion of the road building equipment purchased by Associates for approximately $500,000 which had not been repossessed. The figure of $69,850.44 apparently represented Associates' equity in the property at the time of the agreement between Contracting and Associates. ↩2. A careful reading of the agreement between Associates and SBA, entered into in September 1959, shows that this second group of equipment, although not owned by Associates at the time the loan was made, also became subject to the lien of the SBA to secure the outstanding balance of the loan. ↩3. We arrived at this figure by reference to Associates' fiscal year 1960 income tax return. Since the cost or other basis shown for the property included in Group B substantially exceeded the sales price to Contracting, and we know that the $69,000 figure was Associates' equity in this property, we assume that Associates was carrying its net obligation on the property in Group B at the cost or other basis which was in the approximate amount of $108,000.↩*. Cash. ↩**. J.E. For expenses of Contracting paid by Associates. ↩***. SBA impounded moneys due from Washington, D.C., job and applied on SBA loan due by Contracting.↩4. It appears, however, that this was not quite an accurate description of the property transferred. Our reading of the SBA agreement, which still had a substantial outstanding balance on August 1, 1961, makes clear that the SBA had a lien on this property to the extent of the outstanding balance of its loan.↩