MOUND CITY MACARONI COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 65 C 87(3).

United States District Court
E. D. Missouri, E. D.

Aug. 24, 1966.

William C. Connett, IV, and Harold G. Blatt, St. Louis, Mo., for plaintiff.

Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., by John M. Bray, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

REGAN, District Judge.

This is an action for refund of income taxes in the aggregate amount of $54,-539.34 plus interest. The tax years involved are 1958 and 1959. The issue is whether the V. Viviano & Bros. Macaroni Mfg. Co. (Viviano), which was merged into Mound City Macaroni Co. (Mound City) in January, 1962 realized taxable income when certain of its creditors to which Viviano owed a total of $237,290.-64 accepted $87,000 for their accounts. We have jurisdiction under Section 1346 (a) (1), 28 U.S.C.

Plaintiff (Mound City), a Missouri corporation, was incorporated in 1925 to produce macaroni products for several small firms in St. Louis, including Ravarino and Freschi, Inc. (R & F). The Ravarino and Freschi families were some of plaintiff's original stockholders. By 1956 its stockholders were Charlotte Ravarino, Joseph F. Ravarino, William J. Freschi, Robert Freschi and Albert Ravarino. R & F stock was owned by Charlotte Ravarino, Joseph Ravarino, William J. Freschi, Robert Freschi and Helen Freschi, a sister of William and Robert. Thus, the stockholders of the two corporations are identical except that R & F has one additional stockholder, Helen Freschi. The directors of the two corporations are identical.

By 1950, R & F was the only customer of Mound City, the other firms having withdrawn from business. It was then decided that Mound City should cease to manufacture macaroni products and acquire from R & F its buildings at Kingshighway and Shaw in St. Louis, together with the machinery and equipment therein, and that R & F should rent these facilities and thereafter do the manufacturing. Aside from a small office (20 × 20) maintained by Mound City in one of the buildings rented to R & F, the entire premises were used by R & F as a tenant of Mound City in its macaroni products business. The officers of Mound City (who were also officers of R & F) received no compensation as such, their entire salaries being paid by R & F.

In 1956 Viviano was heavily involved financially, and owed nine large creditors a total of $237,290.64. These creditors were flour mills and packaging supply companies who apparently were interested not only in collecting on their past due accounts, but also in continuing to do business with Viviano or a successor in interest.

On March 21, 1956, Viviano entered into an agreement with the nine creditors (creditors) and Prince Macaroni Manufacturing Company (Prince). Prince was a large macaroni manufacturer in Boston. Prince theretofore had been given an option to purchase the common stock of Viviano. The agreement with the creditors, effective for 4 years from January 1, 1956, is lengthy, but essentially (1) the creditors agreed to defer payment on account of their debts for a period up to 4 years, (2) Prince, through Joseph Pellegrino, its President, was to purchase not less than

50 per cent of the Viviano common stock, (3) Prince was to make available to Viviano additional working capital of at least $50,000, and (4) creditors were to be given preference in the purchase of supplies. The agreement incorporated various safeguards, including a provision permitting the creditors to terminate the agreement and individually declare their debts due and payable if at any time after June 30, 1956, 100 per cent of the creditors agreed that Viviano was or was becoming financially unstable.

Subsequent to the execution of this agreement, Viviano's situation continued to worsen, and the creditors, who had formed a creditors committee headed by Louis Paisley, asked William Freschi and his associates if they were interested in submitting a bid for the purchase of the company. The Freschi group (R & F) decided to negotiate with Paisley for the purchase of Viviano, partly because they did not want a competitor from Boston coming into the St. Louis area, which was already substantially overproduced, and partly because they saw an opportunity to expand their business, Viviano's market being largely in the south and southwest part of the country where R & F did very little business.

During the course of the negotiations for the purchase, Freschi was advised by Paisley (by letter dated July 30, 1956) that the "net losses available for the carry forward amounts to $223,911." Paisley's letter also stated:

"The method of purchase will be left up to you and your auditors and attorneys, so that you can determine the best method of purchase to take advantage of the tax benefits."

Paisley proposed that a sealed bid be submitted to him not later than August 15, 1956, the bid to be based upon the amount of Viviano's assets as represented, together with the fact that Viviano was a going concern, and was to be made upon the express condition that "the problems existing between the creditors and the company * * * and other problems that you are aware of will be resolved." He emphasized that the company would be sold "free and clear" of all such problems.

The record does not reveal what, if any, sealed bid was submitted. However, on September 14, 1956, a contract was entered into between Pellegrino and Peter Ross Viviano (who together owned or controlled all of the Viviano stock) and R & F for the purchase of such stock. By this agreement (1) R & F agreed to "make available the sum of $222,000.00 to acquire all Viviano Company stock and certain debts owed various persons by Viviano Company", (2) Viviano and Pellegrino agreed to "cause" the creditors to assign the whole of their accounts to R & F for $87,000 cash, and (3) R & F agreed to pay Pellegrino and Peter Ross Viviano the sum of $135,000.00. The agreement further provided:

"In the event the large creditors refuse to deliver their accounts for $87,000.00, this contract shall be terminated without liability to either party for any provision thereof."

R & F did not have available the full sum of $222,000 cash which was required to close the purchase, so that it became necessary to determine the best means of obtaining the $87,000 needed to satisfy the creditors. A bank loan at 5 per cent interest could have been arranged, but R & F was reluctant to pay interest, and since Mound City (all of whose stockholders were also stockholders of R & F) had a substantial surplus, the $87,000 was put up by Mound City. As William F. Freschi, plaintiff's witness, stated,

"In other words, we thought it was rather ridiculous, if we could arrange it *among ourselves*, why go out and borrow and place yourself on a limb?"

The decision to use Mound City's money was made after the figure of $222,000 had been agreed upon as the result of the negotiations with Paisley, acting for the creditors, and with the Viviano interests, and was made solely because R & F had a "shortage" of cash. In this connection, Freschi testified that had R & F had the cash it would itself have paid Viviano's creditors the $87,000.

On September 16, 1956, R & F's attorney wrote Paisley, enclosing a draft of the September 14, 1956 contract, calling attention to the closing date of October 1, 1956, and suggesting that Paisley obtain from the creditors executed assignments of their accounts. In the letter the attorney also stated,

"I wish you would leave the name of the assignee in blank, because we may want to take title to these creditors (sic) in the name of an affiliated company of Ravarino and Freschi rather than in Ravarino and Freschi itself."

Accordingly, each creditor executed and delivered an assignment in each of which the name of the assignee was left blank, and at the time of the closing received a cashier's check for its proportionate share of the $87,000. Mound City's money was used for the purpose of purchasing these cashier's checks. The assignments were never completed by filling in the name of any assignee.

At all times relevant to this action, Mound City and R & F have had the same accountant and attorney and have been apprised of the tax consequences of various courses of action. Since the purchase of Viviano, the same attorney and accountant have also acted on its behalf. After the purchase, an entry was made on Viviano's books under the direction of the accountant, purporting to show a liability to Mound City in the amount of $237,290.64, as due "on creditors accounts purchased by and assigned to Mound City Macaroni Co.", and this entry remained on Viviano's books at all times thereafter. A corresponding entry was also made on Mound City's books to show the purchase of "accounts of creditors of V. Viviano & Bros. Macaroni Mfg. Co., aggregating $237,290.64 purchased by Corporation for cost of $87,000.00—carried at cost." Mound City's balance sheet, constituting part of its income tax return for the fiscal year ending June 30, 1958, includes among "Other Assets" (that is, other than items such as accounts receivable) the figure of $87,000 under the heading "Investment".

An important fact bearing on the issue before us is that Viviano at all times operated on an accrual basis, and therefore had deducted as a business expense the full $237,290.64 in the year such amount accrued. The managing operators of R & F and Mound City were fully aware that any payments on the creditors' accounts made by Viviano after its acquisition by R & F could not again be deducted as a business expense, although any such payments to Mound City (in excess of $87,000) would be chargeable to it as income.

There is no evidence that Mound City ever received any payment on any of the assigned accounts (the reasonable inference being to the contrary), nor is there any evidence of a demand for payment or any action taken by Mound City to enforce collection. We note that at various times in 1960 the accounts would have become outlawed by the applicable Missouri 5-year statute of limitations. Section 516.120 R.S.Mo.

Several months after R & F acquired Viviano, the latter company moved much of its machinery and equipment to the Mound City property at Kingshighway and Shaw, transferring title thereto to Mound City. In return, Mound City executed a note in favor of Viviano for slightly more than $88,000. Thereafter, although Viviano continued to be maintained as a separate entity with its own office and sales force, the Viviano products were manufactured on the premises leased by R & F from Mound City.

In the latter part of 1961, R & F discontinued the manufacturing of Viviano macaroni products and arranged a statutory merger of Viviano into Mound City. The merger was consummated, effective January 2, 1962. The net result of the merger was to make legally impossible any payment to Mound City (at least for income tax purposes) on account of the $237,290.64.

Viviano's income tax returns for the years involved were filed with the District Director of Internal Revenue in St. Louis. It had sustained net operating

losses for the 1953, 1954 and 1955 tax years in the aggregate amount (after deducting a carryback to 1952) of $169,892.85. Its 1956 income tax return claimed a further operating loss for that year of $37,334.61. For the years 1958 and 1959, Viviano claimed this net operating carryforward loss of $207,227.46 as an offset for its earnings.

An Internal Revenue Agent examined Viviano's returns for 1958 and 1959, and disallowed the operating loss carryforward for each of these years on the ground that its indebtedness to creditors had been reduced from $237,290.64 to $87,000 by forgiveness and that such reduction of $150,290.64 (to the extent of $127,000.87, "being the excess of your assets over liabilities after the forgiveness"), constituted unreported income which eliminated the loss carryforward. Thereafter, assessments of additional income tax were made against Viviano in the amounts of $37,354.67 for 1958 and $17,184.87 for the year 1959, in each instance after plaintiff failed to agree with proposed assessments in such amounts. Shortly thereafter, plaintiff paid to the District Director of Internal Revenue in St. Louis for the account of Viviano the amounts of these assessments, together with interest to date of payment. The interest paid with respect to the 1958 assessment was $7,630.58, and with respect to the 1959 assessment was $2,479.30. Separate claims for refund for the account of Viviano were filed with the District Director on or about July 10, 1964 for the taxes and interest paid. More than six months having elapsed since the filing of the claims without action thereon by the Commissioner of Internal Revenue this action was brought.

Section 61 of the Internal Revenue Code of 1954 defines gross income as including "income from discharge of indebtedness". The parties are in accord that in the event there was in fact a forgiveness or cancellation of the indebtedness in 1956 to the extent of the difference between $237,290.64, the face amount of the accounts, and $87,000, the amount received by the creditors, the amount of such reduction constitutes part of the taxpayer's gross income for the taxable year.

The resolution of the submitted issue involves an analysis of the stipulated facts, the exhibits, the testimony of William J. Freschi, and the reasonable inferences which may be drawn from all such evidence. Cases of this kind are peculiarly dependent for their solution upon the facts of each case. The underlying principles of law are not essentially in controversy. The parties differ in applying those principles to the facts. Cf. Gooding Amusement Co. v. Commissioner of Internal Revenue, 6 Cir., 236 F.2d 159.

The mere fact that a particular transaction is entered into for the purpose of minimizing or avoiding taxes that might otherwise accrue is, of course, irrelevant. The true question in each instance is whether the transaction is in reality what the taxpayer claims it to be. See Gilbert v. Commissioner of Internal Revenue, 2 Cir., 248 F.2d 399. We look to the actualities, and are not bound by the form and facade in which the transaction is clothed. Higgins v. Smith, 308 U.S. 473, 479, 60 S.Ct. 355, 84 L.Ed. 406.

It is incontrovertible that insofar as the creditors are concerned, they were settling their claims for the aggregate amount of $87,000 as *part* of a transaction which was arranged through their creditors' committee for the sale of Viviano as a going concern. The agreed price was $222,000, of which $135,000 was to go to Viviano and Pellegrino for all of the corporate stock, and the remaining $87,000 was to be paid to the creditors who were thereafter no longer to have any claim against Viviano except for current accounts.

The details and manner in which the matter was handled were immaterial to the creditors, so long as they received $87,000 as part of the integrated transaction. So, too, *R & F* was the only party with whom the creditors dealt. It is simply not true, plaintiff's arguments to the contrary notwithstanding, that *plaintiff*

"negotiated" with the creditors for the purchase of their accounts. It was not until after R & F had contracted for the purchase of Viviano on the basis it would be "free and clear" of the debts that the use of Mound City's money was either discussed or determined upon. The beneficial owners of Mound City and R & F concluded at that time that R & F's cash position precluded it from paying the full $227,000, unless it was to borrow part of it from a bank (at 5 per cent interest) or obtain the needed amount from Mound City without cost to them.

The economic interests of the owners of R & F and Mound City were identical. *Mound City did what R & F wanted* simply because all stockholders and directors of Mound City were also stockholders and directors of R & F. Obviously, there was no arms length bargaining by Mound City. Consider the situation from R & F's point of view. Common sense tells us that R & F would never have entered into the purchase agreement had not the creditors agreed to take $87,000 for their indebtedness. The amount of the agreed purchase price was premised on the understanding that so far as the creditors were concerned, the accounts owing them were to be reduced from $237,290.64 to $87,000.

The assignments of the accounts executed by the creditors were left blank at the instance of R & F because "*we* (that is, R & F) *may* want to take title * * in the name of an affiliated company of Ravarino and Freschi rather than in Ravarino and Freschi itself." Freschi himself testified that R & F thought it ridiculous to pay interest on borrowed money "if we could arrange it *among ourselves* to use Mound City's funds." Beneficially, all of the funds of both companies belonged to the same group of individuals.

■ We simply do not credit Freschi's further testimony that Mound City contemplated ultimate payment to it by Viviano of $237,290.64. To have done so

would have been contrary to the very basis upon which R & F made the purchase of Viviano. It was also belied by the subsequent conduct of the parties. True, proof of subsequent conduct may not be utilized for the purpose of changing a contrary intent which existed at the time of a transaction. Nevertheless, it is equally true that in determining what the original intent of the parties was, their actions (or non action) thereafter may be considered.

In this case, aside from a book entry, there exist no facts whatever which demonstrate the existence of an intent in 1956 to create or continue a bonafide, as distinguished from a paper, indebtedness of $237,290.64 owing from Viviano to Mound City. No attempt was ever made to collect any part of this amount. It is not contended that Viviano could not have made payments on the accounts.[1] In addition, there was a total lack of any plan for payment, either as to the time or method thereof. Moreover, by taking no action at all to enforce collection of the alleged indebtedness, or to obtain a note or security, the parties permitted the Missouri's 5-year statute of limitations to run and thereby bar the debt. We cannot conceive that a bonafide creditor would be so indifferent. It lends corroboration to the finding that there never was an intent to collect the accounts.

The owners of R & F were well aware that it would be disadvantageous to Viviano, which R & F wholly owned, to make any payment on account of the assigned accounts, because no such payments could be deducted as an expense of doing business. The parties were equally aware that any payment to Mound City (at least in excess of $87,000) would constitute income to Mound City. And since the owners of Mound City were also the owners of R & F (and therefore of Viviano) it would be economically undesirable to thus augment their income artificially with no possible benefit to them. They would thereby be paying taxes on their own

---

1. Its profits for the three years following its acquisition by R & F totaled $255,- 466.68, exclusive of the loss carryforward in controversy.

money. There was no rational purpose for Viviano to make any payments on the accounts. We credit Ravarino and Freschi and their associates with enough intelligence to wish to avoid such an absurd result. Significantly, after Viviano exhausted the net operating loss carryforward, on the assumption that it was available, and no further advantage would be gained by retaining the facade of the indebtedness, Viviano merged into Mound City, thereby making legally impossible the payment of the indebtedness with the resultant income tax liability on the part of Mound City.

Not to be overlooked is the fact that Viviano's machinery and equipment, valued at some $88,000, were transferred to Mound City shortly after its acquisition by R & F. In payment therefor Viviano was given a note. There is no explanation of record why the agreed value of the machinery and the equipment was not simply credited against the alleged indebtedness. We also take note of the striking closeness of the $88,000 to the $87,000 which Mound City advanced.

What then was the true intent of the parties at the time of the transaction in 1956? We determine such intent in the light of all the surrounding circumstances. The details of the transaction between R & F and Mound City are left uncertain, but it would appear that the use of Mound City's funds, with no agreement for interest or plan of payment, constituted either a capital contribution from Mound City to Viviano (in the nature of a joint venture with R & F) or at best a loan of $87,000 to Viviano.

We find no credible evidence of a true intent of the parties to continue as a genuine bonafide indebtedness of Viviano the original accounts in their face amount of $237,290.64. We find from all the evidence and the reasonable inferences therefrom a contrary intent. Whatever may have been the form of the transaction, we are here concerned with substance and reality. In any event, plaintiff has failed to sustain its burden of proof.

 We have heretofore noted both the absence of any reasonable expectation that Viviano would pay Mound City the original amount of such accounts, as well as the absence of any economic reason of benefit to the parties beneficially interested for it to do so. The appearance of the debt was preserved solely to take advantage of the loss carryforward. In our opinion, when the creditors agreed to accept $87,000 for their claims of $237,-290.64 as one of the conditions upon which R & F made its purchase of Viviano, and this payment was made in the name of Mound City at R & F's instance, the true intent as distinguished from the paper one, was to cancel the remaining portion of the indebtedness, and such was the result.

The foregoing memorandum constitutes our findings of fact and conclusions of law. It follows that plaintiff is not entitled to recover and that judgment should be in favor of defendant, dismissing the Complaint at the cost of plaintiff. The Clerk is directed to enter judgment accordingly.